**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF FLORIDA**
**Tallahassee Division**

WILLIAM DEMLER, individually,
and on behalf of all others similarly situated,

    Plaintiff,

vs.                                                                                    Case No. 4:19-cv-0094

MARK S. INCH, in his official capacity as
Secretary of the Florida Department of
Corrections,

    Defendant.
_____/

## DECLARATION OF WILLIAM DEMLER

I, William Demler, declare as follows:

1.    I am the Plaintiff in the above-styled case. I am over 18 years old. This declaration is based on my personal knowledge.

2.    I am currently serving a life sentence in the custody of the Florida Department of Corrections (FDOC).

3.    I am currently incarcerated at the South Florida Reception Center, South Unit, at 13910 N.W. 41st Street, Doral, Florida 33178-3014.

4.    My current work assignment in prison is a law clerk. I've been in that assignment for 21 years. As a law clerk, I work in the law library and help other prisoners draft legal documents and conduct legal research.

5. At some point before 2012, the FDOC created a program in certain facilities that allowed prisoners to buy digital music players and access digital music files through an exclusive FDOC vendor. I initially heard about it from other prisoners and posted advertisements.

6. The FDOC started putting up advertisements and notices about the program on bulletins boards around the prisons. I saw these at multiple prisons where I was incarcerated.

7. In 2012, while incarcerated at the FDOC's Hamilton Correctional Institution in Jasper, Florida, I purchased a digital media player through the program for $99.95. At that time the program also offered a media player with larger storage capacity for $119.95, and other accessories for the players, including ear buds ($16.00), armbands ($15.00), and screen protectors ($6.00).

8. The program provided me and many other prisoners with digital access to music. Under the program, I was able to browse, select, purchase, and download digital content to the player.

9. Under the program, I purchased digital media files for a cost of $1.70 per file or song. To order the files, we had to purchase blocks of "Prepaid Media Credits," which required us to buy a minimum of five files for a cost of $8.50.

10. We bought the Prepaid Media Credits using an FDOC MP4 Order Form, which was available at each prison. Usually, the blank forms were available at the officer's station.

11. I would fill out the form and leave it at a designated location in the prison. Over the years and at different prisons, the location has varied from the canteen window, the property room, and the control room in the dorm. The forms were then picked up and processed by Access Corrections employees, once a week or once every other week. The form would be processed, and the cost of the Prepaid Media Credits that I ordered was then deducted from my inmate account.

12. I could use the prepaid credits by connecting my media player to a kiosk at the FDOC institution, where I could download available files to my Reorder Manager, which was my library of songs stored on some offsite server.

13. The kiosks were also used to download digital files from the Reorder Manager to my digital media player. While you could only transfer the number of files that would fit within the memory capacity of the digital media player that you had, there was no limit on the number of files you could have in your Reorder Manager. This feature allowed us to transfer downloaded files back and forth from our player to the library.

14. To maintain the digital media player in working order, we had to connect our players to one of the kiosks every 30 days, in order to extend the

player's security timer. If you failed to do this every 30 days, we were told that the media player would be automatically disabled.

15. This program offered by the FDOC was the only way I and other prisoners could buy and access digital music files. We were prohibited from buying, owning, or using any other digital player.

16. Throughout the time that the program was in effect, the FDOC encouraged prisoners to participate in the program. The FDOC distributed numerous advertisements promoting the various qualities of the players, including memory capacity, screen size, and operating power. The advertisements were put on FDOC's bulletin board and sometimes distributed in the dorm.

17. One particular advertisement that I remember described how we could purchase unlimited music. It said: "Once music is purchased, you'll always own it!" I've talked to many other prisoners who also remember this advertisement.

18. The user guide that came with the media player emphasized the re-ordering capability of the program and stated that a prisoner would never have to purchase the same song twice. I've reviewed the user guide, and it says: "You can delete and Re-Order songs as often as you want. You will never be charged for a song that is ordered from the Re-Order Manager. After all, you have already paid for the song once; we don't think you should ever have to pay for it again."

19. In all the material that was given to prisoners by FDOC describing the program, I never saw anything that suggested that the digital files I purchased would only be available for use during the FDOC's contract with Access Corrections. Nor was there anything given to us by the FDOC that stated that there was a time limit to the program or that the program would expire on a certain date.

20. I believed that I would always own any digital media files purchased through the program for use with my digital media player. I thought that I would be able to listen to them during my entire incarceration.

21. Relying on this belief, I purchased approximately 335 digital media files over the next few years. I spent $569.50 on the purchase of these digital media files, plus additional costs for the digital media player itself, as well as ear buds and other necessary accessories like an armband.

22. I bought the media player and the electronic files because I wanted to listen to music while in prison. We do not have unrestricted access to the Internet in prison, and have no other way of listening to our choice of music. Life in prison can be stressful and is often filled with idle time. I and other prisoners participated in the program to alleviate some of the difficulties that come with prison life.

23. My understanding is that thousands of prisoners participated in the program.

24. In 2017, the FDOC informed us that it was terminating the program and replacing it with a Tablet Program. My understanding is that the FDOC entered into a new contract with JPay, Inc.

25. The FDOC posted notices around the prison telling us that a) the old digital music player program was ending, b) we could continue purchasing files only through December 15, 2017, c) the music files could not be transferred to the new tablets, d) we would not have access to the Reorder Manager (the library of songs we had purchased stored on an offsite server) after January 23, 2018, e) we would be required to surrender our players when we received a new tablet or on January 23, 2019 (whichever came first), and f) we could connect the players to a kiosk to extend the security timer to 365 days. The notices also told us that we could send our players to a family member, who could then send it to Access Corrections to either disable the security timer or put the music on a CD, both for a fee of $24.95.

26. Everyone had to surrender their players, and everyone lost access to their files in their Reorder Manager, regardless of whether you wanted to participate in the new Tablet Program, how many songs you had purchased, the length of your sentence, or whether you had anyone on the outside to send the player to. If you didn't have anyone to send the player to, you were required to surrender it to the FDOC. The FDOC kept the players stored in the property room.

27. Our access to the Reorder Manager was cut off in October 2017, which was earlier than we had been told. After that, I and others could not purchase any more music or access any previously purchased music. If you had files that were in the Reorder Manager but not on the player, you completely lost them.

28. Under the Tablet Program, there are two tablets for sale, for either $79.99 or $129.99, depending on the screen size of the tablet.

29. The tablets were originally offered to all prisoners at a 50% discount for the first 60 days. Prisoners who had purchased a digital media player under the previous program could get a tablet for the first 60 days at either no cost or for $50.00, depending on the screen size of the tablet, and were also supposed to receive a $10.00 media credit within two weeks of placing their tablet order.

30. I chose to get a tablet for free, and I received it in October 2018. At that time, I was forced to surrender my old player to the FDOC, so I lost all of the songs that were on the player. About two months later, I had the player sent to my 92-year old uncle, who has no use for it.

31. The FDOC has not permitted us to transfer any of our old music to the new tablets. If I (or any of us) want to access those songs, we have to re-purchase them under the new tablet program.

32. I received the $10 media credit when I received the tablet. Later a $40 credit appeared on my account, and after that a $25 credit appeared. No explanation was given for these last two credits. I've talked to several other prisoners about this, and the only people who have received these credits are people who participated in the previous digital media player program. I've talked to prisoners who bought a tablet but did not have a digital media player under the old program, and they have not received these credits.

33. Other than the tablet and the media credit, I received no compensation for the digital files that were taken from me. I spent my money on the player and songs, which have now been stolen from me.

34. The offer to have my digital media player mailed to a family member doesn't fix the problem. I'm serving a life sentence, so I'll never get the player back (and my 92-year old uncle has no use for it). But even if I were getting out soon, I bought the player and the music to listen to it while I'm in prison. It's one of the few things we're allowed to own while in prison, and I really enjoyed listening to the music.

35. Also, my understanding is that even if your family member got the player, there is no way to retrieve all the files in your Reorder Manager (which could be an unlimited number) that were not on the player. We were never told

how to retrieve those. I know another prisoner who has attempted to contact Access to try and get those files, but Access is refusing to provide them.

36. Also, I (and all of the participating prisoners I know) have never heard of anyone successfully getting Access Corrections to disable to security timer. In fact, I know another prisoner whose family member has mailed his player to Access, but Access is refusing to disable the security timer. This renders the player inoperable.

37. This whole process has been incredibly frustrating for me and all the other prisoners I know who participated in the program.

38. I filed a grievance to complain about my media player and digital files being taken from me unlawfully and have fully exhausted all administrative remedies by appealing it to all levels. The grievance was denied at every level.

39. I'm fully committed to serving as the class representative in this case. What happened to us was wrong and I want to see it fixed for everyone who was affected. I don't have any conflicts with other class members that I'm aware of.

I declare under penalty of perjury that the foregoing is true and correct. I understand that a false statement in this Declaration will subject me to penalties for perjury.

_William Demler_
William Demler
Date: 5/30/19