## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF FLORIDA
## TALLAHASSEE DIVISION

WILLIAM DEMLER, individually,
and on behalf of all others similarly situated,

      Plaintiff,

v.                                  CASE NO. 4:19-cv-00094-RH/GRJ

MARK S. INCH, in his official capacity as
Secretary of the Florida Department of
Corrections,

      Defendant.

_____/

## DEFENDANT MARK S. INCH'S MEMORANDUM OF LAW IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT

### I.
### UNDISPUTED FACTS

#### A.
#### OVERVIEW

Mr. Demler has filed a Complaint alleging that MARK S. INCH, in his

official capacity as Secretary of the Florida Department of Corrections, by

and through the Florida Department of Corrections (hereinafter "DOC"), has,

"…effectively stolen millions of dollars of digital music and books from

prisoners in its custody…." due to the termination of a digital media Program[1] that was previously in place within the Florida correctional system[2] (DE1, Page 1). The termination of the Program, and its replacement with a different vendor's program[3], is neither a theft of inmate property nor does it serve as a viable basis for violations of Mr. Demler's constitutional rights with regard to substantive due process and property ownership.

The terminated digital media program that is at the heart of this matter, identified by Mr. Demler in Paragraphs 20 through 25 of his Complaint (DE1, Paragraphs 20-25), is commonly known as the Access Corrections (hereinafter "ACCESS") Digital Music Player Program[4]. This program contained certain terms and conditions as an integral part thereof. Mr. Demler has failed to attach a copy of these terms and conditions to his

---

[1] This Program was through Keefe Commissary Network, dba Access Corrections (DE1, Paragraph 19).

[2] Mr. Demler identifies the digital music Program through which inmates were able to purchase digital media players and digital media as the "Digital Music Player Program". See, e.g., Paragraphs 20, 21, 28, etc.

[3] The digital media program at issue was replaced by one through JPay, Inc.

[4] For the sake of avoiding any confusion and for purposes of this Motion and Memorandum of Law, DOC will adopt the moniker given to the ACCESS music Program by Mr. Demler, to wit: the "Digital Music Player Program". In reality, the Program is more accurately called the "Access Corrections Media Program" which includes, as DOC will detail below, certain contractual terms and conditions known as "Terms of Sale for Permanent Music Downloads".

Complaint, but pursuant to well settled law, the provisions set forth in the terms and conditions are pertinent, relevant, and subject to consideration by the Court in adjudicating this Motion.  Further, the terms and conditions are undisputed and speak for themselves.

Mr. Demler builds his claims on the allegations that after DOC replaced the ACCESS Digital Media Program with the ensuing program, DOC forced him (and other prisoners[5]) to mail his digital media players to either ACCESS, who would in turn then mail the players to a designated person outside of prison, or to a family member/designated person outside of prison (DE1, Paragraphs 43, 44, and 62).  As a result of being forced to send his player to someone outside of prison[6], Mr. Demler asserts that DOC has unconstitutionally violated his Fourteenth Amendment substantive due process rights and his rights pursuant to the Takings clause of the Fifth Amendment.

---

[5] This matter has been brought as a purported class action on behalf of all inmates who participated in the ACCESS Digital Music Program but the class has not yet been certified by this Court.  To that extent, DOC's motion for summary judgment will address Mr. Demler's claim(s).  Having said that, the arguments in support of this motion apply to any and all members of the purported class and should be considered with regard to  claims by any and all members of the purported class.

[6] Mr. Demler caused his media payer to be mailed to his uncle (DE40, Page 7).

As DOC will demonstrate, it is entitled to summary judgment as to the claims made by Mr. Demler since the undisputed facts refute any legally recognized violation of Mr. Demler's Fourteenth Amendment substantive due process rights or his rights pursuant to the Takings clause of the Fifth Amendment.

## B.
## THE ACCESS DIGITAL MUSIC
## PLAYER PROGRAM

The ACCESS Digital Music Player Program was a product of a contractual relationship between DOC and ACCESS (DE1, Paragraph 20).  This contract created a vehicle for ACCESS to provide DOC inmates with all canteen services throughout Florida's penal institutions. That included the Digital Music Player Program (DE1, Paragraph 19, 20).

In 2017, DOC decided not to renew its contract with ACCESS for the Digital Music Player Program (DE1, Paragraph 37).  Inmates were then advised that they must dispose themselves of their ACCESS media players within a certain time frame by mailing them outside of the prisons (DE1, Paragraphs 43, 62).

4

More specifically, inmates had three options as to their ACCESS players and the digital music they had purchased and downloaded. The first option allowed inmates to mail their MP3 players to ACCESS and for a modest fee ACCESS would permanently disable the security function on the MP3 player. The player would then be mailed to the prisoner's family or another designated individual in fully functional condition with the music intact. (DE1, Paragraph 43).

The second option allowed inmates to send their MP3 players to ACCESS and for the same modest fee ACCESS would download all purchased, digital music and transfer it onto a CD-ROM. The CD-ROM would then be mailed to the inmate's family or designated individual. (DE1, Paragraph 43).

The third option was for inmates to simply mail their players to designated family members or friends, to be unlocked at a future date if the inmate or a family member/friend so desired (DE1, Paragraph 62).

The ACCESS Digital Music Program was governed by certain contractual terms and conditions. All inmates participating in the Program, including Mr. Demler, agreed to be bound by these terms and conditions upon purchasing their first digital music file. Attached hereto and labeled

5

"Exhibit 1" is the "Access Corrections Media Program Terms of Sale For Permanent Music Download" (hereinafter "TERMS"), the undisputed terms and conditions of the ACCESS Digital Music Player Program, for the Court's consideration.  There is no dispute that Mr. Demler agreed to the TERMS having readily conceded in his Complaint that he, "...purchased approximately 335 digital music files...." through the ACCESS Program.

The Terms make it clear that by purchasing a digital music file, Mr. Demler agreed to be bound by all of the TERMS' provisions:

> "THE TERMS OF SALE FOR PERMANENT DOWNLOADS…***IS A LEGALLY BINDING AGREEMENT BETWEEN YOU…AND...Access Corrections***…."
>
> "***BY PURCHASING PERMANENT DOWNLOADS*** THROUGH THE ACCESS SERVICE ***YOU ARE INDICATING THAT*** YOU HAVE LISTENED TO AND/OR READ THESE TERMS OF SALE, YOU UNDERSTAND THEM, AND ***YOU CONSENT TO BE BOUND BY ALL OF THE TERMS AND CONDITIONS CONTAINED HEREIN***. THESE TERMS OF SALE SET FORTH YOUR RIGHTS AND OBLIGATIONS WITH RESPECT TO YOUR PURCHASE OF PERMANANET DOWNLOADS THROUGH THE ACCESS SERVICE. ***IF YOU DO NOT AGREE TO ALL OF THE TERMS CONTAINED IN THESE TERMS OF SALE, YOU SHOULD NOT PURCHASE ANY PERMANENT DOWNLOADS THROUGH THE ACCESS SERVICE***.

Exhibit 1, Page 1

(Emphasis added)

The TERMS also include certain limitations and restrictions on the availability, use, and/or inmate access to purchased digital music files:

> "***These Terms of Sale apply to Your purchase of Permanent Downloads*** (as defined below) through ACCESS' correctional storefront offering downloads and streams of digital content (the ACCESS Service). As used herein, ACCESS includes Keefe Commissary Network, LLC, and its … partners…."
>
> \*          \*          \*
>
> You understand that ***conditions of Your stay as imposed by the facility***, agency, or any managing entity ***may impose further restrictions on any Permanent Download. These restrictions may require the ACCESS service to remove or otherwise block Your access to one or more Permanent Download and Your prepaid media account will not be credited***."
>
> \*          \*          \*
>
> "***Availability of any Permanent Download is subject to change at any time without notice to You.***"

Exhibit 1
Pages 1, 2 and 6
(Emphasis added)

Keeping the foregoing undisputed facts in mind, the following discussion details the arguments that support a summary judgment in favor of DOC.

**II.**
**DOC IS ENTITLED TO SUMMARY JUDGMENT**
**AS TO THE CLAIMS MADE BY MR. DEMLER**

**A.**
**THE LEGAL STANDARD FOR**
**SUMMARY JUDGMENT**

For purposes of this Motion and solely for purposes of this Motion, DOC will assume the facts alleged by Mr. Demler in his Complaint, as set forth above, are true and correct.  In addition, for purposes of this Motion and solely for purposes of this Motion, DOC will view the facts in the light most favorable to Mr. Demler and afford him every favorable inference from the facts just as the Court will certainly do.

Summary judgment is proper if there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); *Celotex* Corp. *v. Catrett*, 477 U.S. 317, 322 (1986). Understandably, the party moving for Summary Judgment bears the initial burden of demonstrating an absence of evidence to support the nonmoving party's case. *Celotex*, 477 U.S. at 322-23. However, upon meeting this burden, the burden shifts to the nonmoving party to present evidentiary material demonstrating that a genuine issue of material fact exists. *Id.*

Applicable substantive law identifies those facts that are "material." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). Factual issues

8

must have a real basis in the record to be considered genuine and the nonmoving party must show more than a "metaphysical doubt" regarding the material facts. *Matsushita Electric Industrial Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87 (1986).

The evidence and reasonable inferences drawn from the evidence are viewed in the light most favorable to the nonmoving party. *Watkins v. Ford Motor Co.*, 190 F.3d 1213, 1216 (11th Cir. 1999). Although all reasonable inferences are made in favor of the nonmoving party, summary judgment is warranted when the inferences drawn from the evidence, and upon which the nonmoving party relies, are "implausible." *Cuesta v. School Bd. of Miami-Dade County*, 285 F.3d 962, 970 (11th Cir. 2002) (citations omitted). A mere "scintilla" of evidence in support of the nonmoving party's position is not sufficient; there must be evidence upon which a jury could reasonably find for the nonmoving party. *Anderson*, 477 U.S. at 252. *See also Matsushita*, 475 U.S. at 587 (there is no genuine issue for trial if record taken as a whole would not lead a rational trier of fact to find in favor of non-moving party).

As the Supreme Court has succinctly stated, summary judgment is warranted against a nonmoving party who "...fails to make a showing sufficient to establish the existence of an element essential to that party's

case, and on which that party will bear the burden of proof at trial." *Celotex*, 477 U.S. at 322.

To create an issue of fact sufficient to defeat a summary judgment motion, the non-movant's evidentiary material must consist of more than conclusory, uncorroborated allegations. *West v. Higgins*, 346 F. App'x 423, 425 (11th Cir. 2009) (per curiam) (unreported op.) (citing *Earley v. Champion Int'l Corp.*, 907 F.2d 1077, 1081 (11th Cir. 1990)). In order for factual issues to be genuine, they must have a real basis in the record and cannot be based merely on "information and belief". *Earley*, 907 F.2d at 1081. Further, if "...two parties tell different stories [where one] is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment." *Scott v. Harris*, 550 U.S. 372, 380 (2007). If a fact cannot be presented in a form that would be admissible in evidence, it cannot be used for purposes of Summary judgment. *Macuba v. Deboer*, 193 F.3d 1316, 1322 (11th Cir. 1999). *See also* Rule 56(c), Fed. R. Civ. P.

In *McMillian v. Johnson*, 88 F.3d 1573, 1584 (11th Cir. 1996), the Eleventh Circuit clarified its earlier rulings on this point by noting that their cases applying *Celotex* read that decision "...as simply allowing *otherwise admissible evidence* to be submitted in inadmissible form at the summary

10

judgment stage, though at trial it must be submitted in admissible form." The Court continues to apply this principle. *See McCaskill v. Ray*, 279 Fed.Appx. 913, 914 (11th Cir. 2008). However, the court was clear that "...potential impeachment evidence [although admissible] . . . may not be used to create a genuine issue of material fact for trial...." that would defeat a Motion for Summary Judgment. *McMillian*, 88 F.3d at 1584.

**B.**
**CONSTITUTIONAL RIGHTS**
**AND PENAL INSTITUTIONS**

There is a recognized difference between the constitutional rights enjoyed by the general public and those enjoyed by inmates in a penal setting. For decades, the United States Supreme Court has adhered to this concept in addressing a plethora of constitutional challenges made by inmates. *See*, e.g., *Pell v. Procunier*, 417 U.S. 817 (1974); *Wolff v. McDonnell*, 418 U.S. 539 (1974); and *Price v. Johnston*, 334 U.S. 266 (1948) wherein the Court held:

> "...lawful incarceration brings about the necessary withdrawal or limitations of many privileges and rights, a reaction justified by the considerations underlying our penal system."

> *Id*, at 285

11

In *Jones v. North Carolina Prisoner's Labor Union, Inc.*, 433 U.S. 119 (1977), the Court further entrenched this concept, holding that, "...The fact of confinement and the needs of the penal institution impose limitations on constitutional rights...."  Id, at 125.

In addition to the express recognition that inmates' constitutional rights are necessarily limited and can be constitutionally restricted in the penal context, the Supreme Court has also recognized that the operation of a penal institution is extraordinarily complex and difficult.  Accordingly, the Court has decreed that a great deal of deference must be afforded to prison officials by the judiciary when it comes to regulating inmate conduct.  *Id.*, at 126. *See also*, *Cruz v. Beto*, 405 U.S. 319 (1972).

In *Procunier v. Martinez*, 416 U.S. 396 (1974), the Court capsulized its view as follows:

> "Traditionally, federal courts have adopted a broad hands-off attitude toward problems of prison administration. In part this policy is the product of various limitations on the scope of federal review of conditions in state penal institutions. More fundamentally, this attitude springs from complementary perceptions about the nature of the problems and the efficacy of judicial intervention. Prison administrators are responsible for maintaining internal order and discipline, for securing their institutions against unauthorized access or escape, and for rehabilitating, to the extent that human nature and inadequate resources allow, the inmates placed

12

in their custody. The Herculean obstacles to effective discharge of these duties are too apparent to warrant explication. Suffice it to say that the problems of prisons in America are complex and intractable, and, more to the point, they are not readily susceptible of resolution by decree. Most require expertise, comprehensive planning, and the commitment of resources, all of which are peculiarly within the province of the legislative and executive branches of government. ***For all of those reasons, courts are ill equipped to deal with the increasingly urgent problems of prison administration and reform. Judicial recognition of that fact reflects no more than a healthy sense of realism. Moreover, where state penal institutions are involved, federal courts have a further reason for deference to the appropriate prison authorities***.

*Id.*, at 405, 406
(Emphasis added)

_____

With the foregoing general parameters in mind, we now turn our attention to  Mr. Demler's claims.

## C.
## DOC IS ENTITLED TO SUMMARY JUDGMENT AS THE FACTS FAIL TO ESTABLISH THE DEPRIVATION OF ANY OF MR. DEMLER'S CONSTITUTIONAL RIGHTS

### 1.  Mr. Demler's Constitutional Rights

In an action brought pursuant to 42 U.S.C. § 1983, Mr. Demler must establish that the Defendant's conduct deprived him of rights, privileges, or immunities secured by law or the Constitution of the United States.  *Blessing*

13

*v. Freestone*, 520 U.S. 329, 340 (1997); *Burban v. City of Neptune Beach, Florida*, 920 F.3d 1274 (11th Cir 2019); *Martes v. Chief Executive Officer of South Broward Hospital*, 683 F.3d 1323 (11th Cir. 2012); *James v. Tex. Collin Cty.*, 535 F.3d 365, 373 (5th Cir. 2008); *Evans v. Echeverri*, 2010 WL 144987 (N.D. FL 2010).

Clarifying its *Blessing* decision in an effort to ensure that Courts limited 42 U.S.C. § 1983 actions to unambiguously conferred constitutional rights, the Court followed *Blessing* with its decision in *Gonzaga University v. Doe*, 536 U.S. 273 (2002), wherein it held:

> "Some language in our opinions might be read to suggest that something less than an unambiguously conferred right is enforceable by § 1983 ... ***We now reject the notion that our cases permit anything short of an unambiguously conferred right to support a cause of action brought under § 1983***. Section 1983 provides a remedy only for the deprivation of "rights, privileges, or immunities secured by the Constitution and laws" of the United States. Accordingly, it is *rights,* not the broader or vaguer 'benefits' or 'interests', that may be enforced under the authority of that section."

> *Id*. at 282, 283
> (Emphasis added)

Furthermore, as we previously noted, lawful incarceration inherently places limitations on the rights enjoyed by individuals. *Pell, supra*. One of the rights afforded to ordinary citizens that may be constitutionally limited in

14

the context of incarceration is the right to possess property. *Ford v. Schmidt*, 577 F.2d 408 (7th Cir. 1977).

In the case at hand, there has been no deprivation of Mr. Demler's constitutional rights, privileges, or immunities, unambiguous or otherwise. This is true in a general sense and especially when one takes into account that Mr. Demler is a lawfully incarcerated inmate whose rights, privileges, and immunities are not the same as those afforded to ordinary individuals.

Mr. Demler's claims rest on the allegation that because of the termination of the Digital Music Player Program he will, "...not be permitted **to retain** any of his digital media files....", but instead, "...could have his digital media player and/or files mailed to a family member...." (DE1, Paragraphs 60 and 62).   Mr. Demler also alleges that DOC's conduct, "...deprived [him] of **the use and enjoyment**...." of his digital music (DE1, Paragraph 63).  Finally, Mr. Demler alleges that his digital media files were "effectively" stolen from him (DE1, Paragraph 63).

These allegations do not rise to the requisite level of being actionable from a 42 U.S.C. § 1983 or constitutional perspective as they do not involve unambiguously conferred rights, as discussed below.

### 2. Mr. Demler's Specific Claims

In Count I of the Complaint, Mr. Demler alleges that he has a "...constitutionally protected and fundamental right to property...." in the form of the digital music he purchased through the ACCESS Digital Music Program (DE1, Paragraph 74). In support thereof, Mr. Demler asserts that the replacement of the Digital Music Player Program with the newer Multimedia Tablet Program has resulted in an unconstitutional deprivation of his "ownership" of said music[7], comprising a violation of the Fifth Amendment's Takings Clause that is at issue herein.

In Count II of the Complaint, Mr. Demler attempts to state a claim for violation of his Fourteenth Amendment substantive due process rights arising out of a claimed, "...fundamental right to property...." in his purchased digital media files[8].

Clearly, both of Mr. Demler's claims are expressly based on the alleged premise that INCH's conduct has deprived Mr. Demler of "ownership" of his personal property. However, as a matter of law, Mr. Demler's allegations fall well short of what is required to allege

---

[7] *See* DE1, Paragraphs 76, 77, 79, 80, 81, 82, et.al.

[8] *See* DE1, Paragraph 89

16

constitutionally redressable ownership deprivation issues based upon the Fifth or Fourteenth Amendments.

Close scrutiny of Mr. Demler's  allegations regarding the ownership issue reveal that at best he merely alleges a restriction of his ***possession*** of property, not that he has been deprived of property ***ownership***.  In accordance with an overwhelming number of cases that have addressed this precise issue, there is a constitutionally significant distinction that renders Mr. Demler's claims untenable.

### 3.  Substantive Due Process – Property Ownership v. Possession

Inmates do not enjoy a constitutional right to possess any given item of personal property while incarcerated.  *Nevada Dep't of Corr. v. Cohen*, 581 F.Supp2d 1085 (D. Nev, 2008);   *Nevada Dep't of Corr. v. Green*, 648 F.3d 1014 (9th Cir. 2011).  In addition, as a matter of well settled law, prison authorities may place reasonable restrictions on the quantity and type of personal property that an inmate may possess without violating an inmate's substantive due process rights.  *Bell v. Wolfish*, 441 U.S. 520 (1979); *Williams v. Bierman*, 46 F.3d 1134 (7th Cir. 1995).

More importantly and particularly pertinent to the issue at hand, when an inmate is no longer permitted to retain possession of an item or items of property, so long as he or she still retains control over it, there is no

17

constitutional deprivation of property rights from a substantive due process perspective. *Cohen, supra*; *Williams v. Meese,* 926 F.2d 994, 998 (10th Cir.1991) (finding inmate was not deprived of property without due process of law where prison official sent inmate's property to an address of the inmate's choosing - while the inmate no longer had possession of the property, he still had control over it); *Hatten v. White*, 275 F.3d 1208 (10th Cir. 2002) (affirming summary judgment for prison employees on inmate's claim of deprivation of property without due process where inmate's property was sent to a person of his choosing outside of the prison thereby restricting the inmate's possession of the property but not depriving him of ownership); *Stringer v. DeRobertis*, 541 F.Supp. 605 (N.D. Ill. 1982) (finding that inmates who ordered almost $1,000 in written materials, with the prior consent of prison officials, but who were subsequently denied the ability to take possession of the materials, suffered no constitutional deprivation because they were allowed to relinquish possession of the materials to others designated by them); and *Sorrentino v. Godinez*, 2013 WL 5497244 (N.D. Ill. 2013) (finding that because the plaintiffs were given a reasonable opportunity to store or dispose of their personal property before allowing prison officials to confiscate the property, there was no violation of the inmates' substantive Due Process rights).

18

In *Pryor-El v. Kelly*, 892 F.Supp 261 (D.D.C. 1995), the Court was confronted with a situation that is virtually indistinguishable from the one that Mr. Demler has presented to this Court, i.e. one in which an inmate claimed that the seizure of personal property, and its shipment to a relative at an address outside the prison at the expense of the inmate, constituted a violation of his substantive due process rights.  Rejecting the argument that such a situation gave rise to a redressable substantive due process claim, the Court held:

> "Accordingly, because Plaintiff has not suffered a deprivation sufficient to trigger the protections of the Due Process Clause, he fails to state a claim thereunder. The Court will therefore GRANT the Defendants' Motion to Dismiss Plaintiff's claims regarding the shipment of his property home...."

*Id.* at 271

Even when inmates have been required to dispose of their personal property by mailing it to family or friends with no reasonable expectation that said individuals will ever return the property, Courts have held that no substantive due process violation exists.

In *Searcy v. Simmons*, 299 F.3d 1220 (10th Cir. 2002), Mr. Searcy was an inmate who was permitted to have a television, radio, and typewriter in his cell.  Searcy's television, radio, and typewriter were later confiscated by

prison authorities and mailed to Searcy's out-of-state relatives.  Before this took place, Searcy was provided an opportunity to  identify to whom the property should be sent outside of the prison but he refused to cooperate.

Mr. Searcy alleged that sending his property to relatives deprived him of his ownership rights and due process especially since he claimed that those relatives would never return the property to him.   Rejecting Mr. Searcy's contention that a constitutional due process violation had resulted, the Court held that, "...there is a difference between the right to **_own_** property and the right to **_possess_** property while in prison." *Id.* at 1229 (Emphasis added).  "...**_Mr. Searcy is still the owner of the property_**...." and the act of sending the property to relatives, "...**_did not deprive Mr. Searcy of ownership_** of the property." *Id.* at 1229 (Emphasis added).

> "While there may be a case...where a prison so limits an inmate's control over his property that it has effectively vanquished[9] any meaningful ownership interest*,* this is not it."
>
> *Id.* at 1229
> (Emphasis added)

---

[9] INCH emphasizes the Tenth Circuit's use of the term "effectively vanquished" for it is analogous to the contention being made by Mr. Demler herein, to wit: that his property has been "effectively" stolen.  In *Searcy,*  the Court expressly rebuffed the argument that requiring an inmate to send his property to a family member rose to the level of depriving the inmate of ownership of the property, effectively or otherwise. To the extent DOC's conduct herein is identical to that of the State of Kansas, DOC has not "effectively" deprived Mr. Demler of any property ownership or due process rights.

See, also *Cohen, supra*; and *Wenzler v. Warden of G.R.C.C.*, 949 F.Supp. 399 (E.D. Va. 1996).

Thus, the act of confiscating an inmate's property and mailing it to relatives outside the prison system is not one that deprives an inmate of his ownership of the property.  Further, it is not a violation of the inmate's substantive due process rights.

As with *Searcy* and the numerous other cases cited above,  Mr. Demler has not been deprived of his ownership of the digital music at issue, only its possession.   When DOC ended its relationship with ACCESS and required Mr. Demler to mail his digital player and its music content outside the institution[10], Mr. Demler was provided with options that have been deemed to be constitutionally valid.

At best, Mr. Demler no longer has possession of his music, but in no way has DOC deprived him of its ownership.  In order to prevail, Mr. Demler must have been deprived of the property's ownership, and to the extent the facts indisputably establish that no such deprivation has taken place, DOC cannot be deemed to have violated Mr. Demler's Due

---

[10] Either to his uncle, another person of his choosing, or ACCESS for permanent unlocking of the device or downloading of music to a CD-ROM.

21

Process constitutional rights by taking the action that predicates his claim.

### 4. Substantive Due Process – "Shock The Conscience" Test

A second legal doctrine supports DOC's contention that the facts in the case at hand do not give rise to a violation of Mr. Demler's substantive due process rights. In order for DOC's conduct in this matter to support a claim for a deprivation of substantive due process rights, the conduct of which Mr. Demler complains must rise to the level of shocking the conscience. In the instant case, DOC's conduct fails to satisfy this threshold. Therefore, it is insufficient to establish a substantive due process violation.

Courts are uniformly in agreement that in order for conduct to rise to the level of an unconstitutional substantive due process violation, the conduct in question must be arbitrary[11], oppressive in the constitutional sense[12], and "...so egregious, so outrageous, that it may fairly be said to shock the contemporary conscience." *County of Sacramento v. Lewis*, 523 U.S. 833 at 847 n. 8 (1988). *See also*, *Maldonado v. Fontanes*, 568

---

[11] *Daniels v. Williams*, 474 U.S. 327 (1986)

[12] *DeShaney v. Winnebago Cty. Dep't of Soc. Servs.*, 489 U.S. 189 (1989)

F.3d 263 (1st Cir. 2009); and *Tanney v. Boles*, 400 F.Supp.2d 1027 (E.D.Mich. 2005).

In *Romans v. Velleca*, 2012 WL 4445475 (D.Conn. 2012), the Court analyzed the Fourteenth Amendment's substantive due process protection and the case law that requires a conscience-shocking act in order to trigger a viable claim. Upon doing so, the Court concluded that:

> "Constitutional violations do not, in and of themselves, 'shock the conscience' for the purposes of substantive due process... Therefore, where factual allegations shock the conscience only insofar as they constitute specific constitutional violations, plaintiffs may not seek redress under substantive due process."

> *Id.*, at *10

Taking it one step further and even closer to home, Courts that have been confronted with inmate allegations of property deprivation have consistently found that they fail to meet the threshold for substantive due process violations because the conduct at issue did not rise to the level of shocking the conscience. *See*, e.g., *Booth v. King*, 346 F.Supp.2d 751 (E.D.Pa. 2004) (wherein the Court held that the confiscation of Booth's cup, legal documents, medication, and religious materials was not "conscious-shocking" behavior); and *Newman v. Coats*, 2009 WL 1260020 (E.D.Mich. 2009) (wherein the Court held that

the confiscation of Newman's medical supplies did not satisfy the Fourteenth Amendment's "shock the conscience" test and thus there was no viable substantive due process claim).

Property deprivation allegations fall further short of the requisite mark when an inmate's personal property has been confiscated and he has been afforded an opportunity to mail the property out of the institution. In *Morefield v. Smith*, 404 Fed.Appx. 443 (11th Cir. 2010), the Eleventh Circuit affirmed a summary judgment in favor of Georgia state prison officials who confiscated Morefield's legal materials and then offered him the opportunity to mail the materials out. Rejecting Morefield's claim that the Georgia officials had violated his substantive due process rights, the Eleventh Circuit held:

> "While the record is unclear as to whether his legal documents were ultimately mailed out or destroyed because Morefiled did not have the money for postage yet attempted another mailing option, ***the fact that he had an opportunity to mail out his legal property shows that the deprivation of his legal property was not so egregious or 'conscience shocking' as to constitute a due process violation***. Accordingly, because the deprivation of Morefield's legal property should not be 'characterized as arbitrary, or conscience shocking, in a constitutional sense,' ***the defendants did not violate Morefield's substantive Fourteenth Amendment due process rights.***"

24

*Id.*, at 445
(Emphasis added)

Applying the interpretation of the Fourteenth Amendment's substantive due process protection by the United States Supreme Court, two Circuit Courts of Appeal, and a number of federal district courts, DOC's conduct insofar as Mr. Demler's digital music player and digital music is concerned is neither arbitrary, oppressive in the constitutional sense, nor something that is so egregious or so outrageous that it shocks the conscience sufficiently to violate Mr. Demler's substantive due process rights. For this reason, summary judgment is warranted.

### 5. Mr. Demler's Fifth Amendment Takings Clause Claim

The ownership/possession distinction discussed above is dispositive of not only Mr. Demler's Fourteenth Amendment substantive due process claim, it is equally dispositive of his Fifth Amendment Takings Clause claim.

Just as numerous judicial decisions have rejected substantive due process claims similar to Mr. Demler's in which the ownership of personal property was not extinguished through the defendants' conduct, a number of judicial bodies have also rejected Fifth Amendment Takings Clause claims based upon facts similar to those raised by Mr. Demler in

the case at hand.  In situations such as the one at hand where an inmate has not been deprived of his actual ownership of property, but rather its use or immediate possession, including situations where an inmate is offered the option of mailing the property to persons outside of an institution, no Fifth Amendment property rights are affected.  See, e.g., *Cohen, supra; Sorrentino, supra.*

In *Savko v. Rollins*, 749 F.Supp. 1403 (D. Md. 1990), the State of Maryland's correctional department enacted a rule change that prohibited possession of certain previously authorized personal property. The rule went on to mandate that within thirty days of notification, said property could no longer be possessed, inmates were required to either have someone pick the property up on their behalf, mail the items to persons outside of the institutions at the inmate's expense, or have the property confiscated and disposed of.

A class of inmates sued claiming that this policy impermissibly infringed on their Fifth Amendment property rights.  The Court rejected the argument and determined that this type of a situation did not involve a Fifth Amendment violation of the Takings Clause.  To the contrary, the Court determined that it was a constitutionally permissible act.

As for having to absorb the cost of mailing the property to others outside the prison system, the Court likewise found no Fifth Amendment constitutional infirmity:

> "***The requirements that inmates mail confiscated property to a person outside the institution at the inmate's own expense is likewise not violative of the Takings Clause***. Inmates are offered three alternatives with respect to property confiscated pursuant to DCR 220-6. The regulation does not force inmates to mail the confiscated property to persons outside the institution and thereby incur postage fees. Clearly, the effect of the regulation is to allow inmates an opportunity to salvage property which would otherwise be subject to forfeiture and disposition by the State."

*Id,* at 1414
*(Emphasis added)*

In the case at hand, Mr. Demler expressly acknowledges that DOC gave him the opportunity to mail his digital media player and/or music files to a family member.   From a constitutional perspective, this accommodation more than suffices to negate any unconstitutional control by DOC over either Mr. Demler's MP3 player or his music.

Applying *Savco* and *Cohen*, the situation predicating Mr. Demler's Fifth Amendment claim does not rise to a redressable level and therefore summary judgment is warranted.

27

**D.**
**DOC IS ENTITLED TO SUMMARY**
**JUDGMENT BASED UPON THE TERMS OF**
**THE DIGITAL MUSIC PLAYER PROGRAM**

Documents referenced in a Complaint are pertinent, relevant, and properly considered by a Court even though they are not attached as Exhibits to the Complaint when said documents are central to the plaintiff's action. *Venture Associates Corp. v. Zenith Data Systems Corp.*, 987 F.2d 429 (7th Cir. 1993); *Dean v. New York City Transit Authority*, 297 F.Supp.2d 549 (E.D. NY 2004); and *Fralin v. County of Bucks*, 296 F.Supp.2d. 609 (E.D. PA 2003). Contracts are especially worthy of consideration despite having been omitted as exhibits from a Plaintiff's Complaint. *Yassan v. J.P. Morgan Chase & Co.*, 708 F.3d 963 (7th Cir. 2013); *Cortec Industries, Inc. v. Sum Holding, L.P.*, 949 F.2d 42 (2d Cir 1991); and *Meighan v. TransGuard Ins. Co. of America*, 978 F.Supp.2d 974, 980 (N.D. Iowa 2013). The foregoing law applies even to cases brought pursuant to 42 U.S.C. § 1983. *Wright v. Associated Ins. Co. Inc.*, 29 F.3d 1244 (7th Cir 1994).

Of particular import are contracts that have been labeled as "relationship-forming" contracts. In *Sampson v. Washington Mutual Bank,* 453 Fed.Appx. 863, 866 (11th Cir. 2011), the 11th Circuit considered contracts that were not exhibits to a Complaint but which were subsequently

28

attached to the Defendant's Motion challenging the viability of the claims raised.   The Court held that the documents were central to the plaintiff's claims because they formed the basis for the relationship between the parties and therefore predicated the claims being made.   Thus, the documents were properly considered by the Court in weighing the Defendant's Motion.

In *SFM Holdings, Ltd. v. Banc of Am. Sec, LLC,* 600 F.3d 1334 (11th Cir. 2010), the Eleventh Circuit further illustrated the point.  In *SFM Holdings*, suit was filed against Banc of America Securities for constructive fraud and breach of fiduciary duties arising from the Plaintiff's brokerage account.  The Plaintiff failed to attach a copy of the documents used to open the account but the Defendant attached it as part of a motion testing the validity of the claims made.   The Court held that even though the documents were not attached to the Complaint, because the documents set forth the terms and conditions upon which Banc of America Securities opened and maintained the accounts with the customer, the documents constituted a relationship-forming contract central  to  the  plaintiff's  claim  and  were  necessarily considered.

In the case at hand, the TERMS constitute the relationship-forming document  that  is  central  to  Mr.  Demler's  claims.   The TERMS specify

precisely what Mr. Demler agreed to when he voluntarily chose to avail himself of the option to purchase digital music files. Mr. Demler agreed to be bound by the TERMS as of the moment he elected to purchase digital music through the ACCESS Program.  Those TERMS unequivocally permit DOC and ACCESS to restrict his use of the digital music purchased at any time.  As clearly set forth in the TERMS, this restriction included, but was not limited to, the removal of music downloads from Mr. Demler's digital music collection and blocking Mr. Demler's access to any or all of his digital music.

In short, by taking part in the Program, purchasing digital music files, and thereby agreeing to the TERMS, Mr. Demler agreed that the availability of his digital music was subject to change at any time, without any notice and without compensation.  Thus, when DOC decided to replace its prior vendor with a new one, and in turn, required inmates to mail their ACCESS digital music players to someone outside the prisons, DOC was acting in a manner contemplated, permitted, and specifically authorized by the TERMS.

Mr. Demler was not forced into agreeing to TERMS that gave DOC and ACCESS the ability to restrict his access to the digital music files he purchased.  Had he not wished to be bound by them, he had the option of

not taking part in the Program, but he agreed to the TERMS and is now bound by them.

Two Florida judicial bodies have recently addressed the specific issue of whether the TERMS are enforceable as a matter of Florida law.  On February 11, 2019, in *Nathaniel Carswell v. Julie Jones*, Case No. 2018-SC-471 (County Court, 2nd Judicial Circuit in and for Leon County, Florida), the Honorable Monique Richardson entered an Order[13] dismissing a Complaint with prejudice in a suit for tort and breach of contract arising out of the identical situation being litigated by Mr. Demler in the case at hand.  In her Order of dismissal, Judge Richardson determined that:

> "The Court further finds that pursuant to the contract language, Defendant was a "partner" of Access Corrections, and/or a "third party provider" of the Access service/Media Program, and therefore was a party to the contract. As such, ***Defendant has whatever rights, duties, and obligations that are conferred upon Access Corrections, including enforcement of the contract language***."

> Exhibit 2, Page 2
> (Emphasis added).

More recently, on May 31, 2019, in *Victorino v. Department of Corrections*, No. 2018 CA 1754, 2019 WL 2504534 (Fla.Cir.Ct. May 31,

---

[13] A copy of which is attached hereto and labeled "Exhibit 2".

2019), the Honorable Judge Angela Dempsey was confronted with another matter predicated upon the same facts as the ones at issue in the case at hand.  Arriving at the same legal conclusion reached by Judge Richardson in the *Carswell* matter relevant to the enforceability of the TERMS and their application to claims arising out of the ACCESS Digital Music Program, Judge Dempsey ruled that:

> "The evidence establishes that the Terms and Conditions for the Access Corrections Digital Music Program were readily available for Petitioner to review. ***Petitioner was bound by those Terms and Conditions, and the Terms and Conditions are enforceable by Respondent.***"
>
> *Id.* at 1
> (Emphasis added).

Accordingly, the only two Florida state courts that have been confronted with the issue of whether the TERMS are enforceable have both decided that the TERMS are enforceable and that they must be given full force and effect.  Although the issue has not been addressed by a Florida appellate court, these two rulings serve as persuasive authority for this Court to likewise enforce the terms and conditions of the contract.

But aside from the foregoing Florida judicial rulings, the TERMS should be enforced by this Court given their clear and unambiguous language.  The provisions of the contract voluntarily entered into by Mr.

Demler specifies that any or all of the digital music Mr. Demler purchased was subject to being restricted, removed, blocked, and/or rendered unavailable to him at any time, without notice, and without compensation.

Accordingly, without question, weighing the facts in the light most favorable to Mr. Demler and accepting all of his allegations as true, DOC is entitled to summary judgment because any conduct on its part was well within what was permissible pursuant to the provisions of the Digital Music Player Program agreed to by Mr. Demler.

### III.
### CONCLUSION

For the reasons explained above, DOC is entitled to summary judgment.

### IV.
### CERTIFICATE OF COMPLIANCE WITH LOCAL RULE 7.1(f)

I hereby certify that this Motion and incorporated Memorandum of Law contains 6,729 words, exclusive of case style, signature block, and certificate of service.

**ASHLEY MOODY**
**ATTORNEY GENERAL**

*/s/ Miguel A. Olivella, Jr.*
MIGUEL A. OLIVELLA, JR.
Senior Assistant Attorney General
Fla. Bar No. 253723

33

Office of the Attorney General
Complex Civil Litigation Division
The Capitol - PL 01
Tallahassee, FL 32399-1050
(850) 414-3817
Miguel.Olivella@myfloridalegal.com
Attorney for Defendant
Mark S. Inch

## **CERTIFICATE OF SERVICE**

**I HEREBY CERTIFY** that a true and correct copy of the foregoing was

filed electronically with the court using CM/ECF on this 21st day of August,

2019.

*/s/ Miguel A. Olivella, Jr.*
MIGUEL A. OLIVELLA, JR.