**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF FLORIDA**
**TALLAHASSEE DIVISION**

WILLIAM DEMLER, individually, and
on behalf of all others similarly situated,

      Plaintiff,

v.                                **CASE NO. 4:19-cv-00094-RH/GRJ**

MARK S. INCH, in his official capacity
as Secretary of the Florida Department
of Corrections,

      Defendant.

_____/

**DEFENDANT MARK S. INCH'S MEMORANDUM OF LAW**
**IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT**

      Plaintiff, individually and on behalf of a class yet to be certified[1], has

filed a Complaint alleging that MARK S. INCH ("DOC"), has violated his

substantive due process rights and/or has taken his property without just

compensation.

      These alleged violations stem from the termination of the Access

Corrections ("ACCESS") Digital Music Player Program[2] ("PROGRAM")

---

[1] All arguments made as to Plaintiff apply to any class that is ultimately certified by the Court and should be treated as such.

[2] The PROGRAM was through Keefe Commissary Network, ACCESS' parent company. All references to ACCESS include Keefe.

1

within the Florida correctional system[3] (DE1 at 1).  The replacement of the PROGRAM resulted in inmates no longer being able to possess the digital music player and digital music they purchased through the PROGRAM.

This case rests entirely on two issues.

First, whether promises allegedly made to inmates through written materials created by ACCESS can be imputed to DOC in one of two ways: 1) an alleged agency relationship between ACCESS and DOC;  or 2) deeming DOC to have made the alleged promises by its "posting" of the written materials within institutions.

The promises allegedly made to inmates were that they would own any purchased music "forever", and/or once music was purchased, they would, "...always own it." (DE1 Paragraphs 2 and 28).

The undisputed facts establish that inmates were never promised ownership of the music, forever or otherwise.  Further, they were never promised that digital music purchases would be available to them for any length of time.  Moreover, if any promises were made, they were not made by DOC and they may not be imputed to DOC.

---

[3] Plaintiff identifies the digital music PROGRAM through which inmates were able to purchase digital media players and digital media as the "Digital Music Player PROGRAM".  See, e.g., Paragraphs 20, 21, 28, etc.

_____

The second issue is whether constitutional relief is available to inmates when dispossessed of their ability to personally use a purchased license for digital music. The undisputed facts establish that there has been no diminution in the value of the licenses purchased by inmates since, by definition and operation of law, these licenses have no economic value.

In the alternative, even if there has been some semblance of diminution in the economic value of the licenses, there has not been a total or complete diminution such that a constitutional violation has resulted.

Because the undisputed facts do not establish viable claims made by Plaintiff, individually or on behalf of a class, summary judgment is warranted in favor of DOC.

## I.
## PREFACE

The Court has set a March 3, 2020 summary judgment motion deadline (DE 124) requiring DOC to file its motion even though a class has not been certified[4], there is no class representative, and Demler has been disqualified from serving as class representative.

_____

[4] The Court has instructed the parties, "...to prepare in the expectation that upon amendment to the complaint, a class will be certified...." (DE 118). With no class currently certified, DOC doesn't know the parameters or makeup of the class for purposes of summary judgment arguments.

3

Accordingly, DOC must defend against Plaintiff's individual claims and those that have been made on behalf of a yet-to-be certified class.  DOC is also forced to make all class related summary judgment arguments based upon the undisputed facts that exist at this time without the benefit of deposing the new Plaintiff's that will be added after the summary judgment deadline has passed.  That necessitates DOC using Demler's testimony, allegations, and admissions both as to his individual claims and all class related claims for purposes of its summary judgment arguments.

## II.
## OVERVIEW

### A.
### DOC'S INITIAL MOTION FOR SUMMARY JUDGMENT

On August 21, 2019, DOC filed a Motion for Summary Judgment[5].  In denying the Motion[6], the Court made the following findings:

1)  Inmates can be constitutionally dispossessed of property and, "... required to send property out of a facility to relatives or other custodians." (DE 64 at 6);

---

[5] DE 54, adopted and incorporated by reference herein with all arguments made therein being made here as if fully set forth.

[6] DE 64.

2)  DOC participated in the sale of the property to inmates and took "a cut" of the sales price.  (DE 64 at 6);

3)  Plaintiff asserted that ACCESS made promises to him[7] that he, "...would be allowed to use the property in the facility permanently...." and/or that, "...he would be able to possess his MP3 player and music permanently...."  and because the record did not challenge these assertions they were accepted as unchallenged (DE 64 at 6, 7, and 8).

4)  Plaintiff sought to impute the foregoing promises to DOC solely through unsupported allegations.  Because the record did not refute the imputation of the promises, the Court accepted the allegations (DE 64 at 6, 7, and 8);

4)  This case involves not only physical property, to wit: the MP3 players, "...***but a license to play music that is not otherwise owned***." (DE 64 at 7, Emphasis added);

5)  Depriving an owner of ***all*** economically beneficial use of property, ***rather than just some*** of a property's value, may constitute a constitutional taking;

6)  Plaintiff's allegations suggested that termination of the PROGRAM prevented him from sending, "...all the disputed property to relatives outside

---

[7] And all inmates.

the facility...." Further, Plaintiff alleged that some of his music was not stored on the player but rather "in the cloud" and no longer available (DE64 at 8). Because the Court found that these allegations were not challenged by the record, they were accepted; and

7)  The terms of sale for digital music purchases, "...if Mr. Demler agreed to them....", may authorize the dispossession of the music at issue but the record did not establish whether Plaintiff was bound by the terms and whether they authorized the dispossession of the digital music.

**B.**
**THE UNDISPUTED FACTS RESOLVE ALL PRIOR**
**SUMMARY JUDGMENT ISSUES IN DOC'S FAVOR**

There no longer are any disputed issues of fact that would negate the entry of summary judgment in favor of DOC.

First, inmates were never promised that they would "own" purchased music nor "own" it forever.

Second, if any such promises were made, DOC never made them nor can they be imputed to DOC.

Third, inmates never owned the digital music they purchased.  To this day, inmates do "own" their MP3 Players and continue to "own" whatever ownership interest they acquired in the digital music licenses.

Fourth, by his own admission, Plaintiff has not "lost" any of his music and was successful in sending all of his music to his uncle outside his institution.

Fifth, none of the music purchased by inmates has been "lost". It is all currently available and retrievable by any inmate at any time from ACCESS.

Finally, DOC constitutionally dispossessed inmates of their players and digital music in accordance with the substantive due process rights enjoyed by inmates. A restriction on the use of a license is not a constitutionally protected interest that is redressable pursuant to 42 U.S.C. § 1983 nor through the Takings Clause. Moreover, inmates have not been deprived of any/all economically beneficial use of the licenses they obtained for the purchased digital music negating any viable takings claim.

### III.
### UNDIPUTED FACTS

### A.
### WILLIAM DEMLER

Plaintiff recently admitted that he has not lost any of his music stored on the ACCESS server or its "Reorder Manager" (DE 126-1, at 54 Line 16-17, 24-25, and at 55 Line 1). Plaintiff also admitted that he has never contacted ACCESS to request that his server-stored music be downloaded

onto a CD-ROM[8] (DE 95-1, Paragraph 22). Finally, Plaintiff has confirmed that none of his music has been lost and it is all currently stored on his digital player[9] (DE 95-1, Paragraph 25; DE 126-1, Page 29 Line 5-8).

After the PROGRAM was terminated, Plaintiff knew he could mail his player to ACCESS and have ACCESS download his music onto a CD-ROM (DE 126-1, at 27 Line 24-25, at 28 Line 1-5). He also knew he could send the player to anyone he chose outside the institution (DE 126-1, at 27 Line 16-23), and he knew he could send the player to ACCESS and have the security timer permanently removed (DE 126-1, at 28 Line 16-23).

Most important of all, Plaintiff admitted that **he currently owns all 335 songs that he purchased** (DE 126-1, Page 32 Line 25 – Page 33 Line 17).

With regard to the terms and conditions governing the PROGRAM (hereinafter the "TERMS"[10]), Plaintiff admitted that his digital player contained an audio file that set forth the TERMS (DE 126-1 at 44 Line 11-17). He admitted to listening to a portion of the audio file, stopped it, and

---

[8] This was confirmed by Ms. Carla Knysak, ACCESS' representative. At no time has Plaintiff sent his player to ACCESS for music download, security timer removal, nor has he attempted to have his music downloaded from the ACCESS server (DE 95-1 Paragraphs 20-23).

[9] Confirmed by Ms. Knysak (DE 95-1, Paragraph 24 1nd 25).

[10] DE 56-1 is a transcribed version of the audio file.

then transferred it to his Reorder Manager (DE 126-1, at 44 Line 19 through 47 Line 6; at 52 Line 9-13). At any time thereafter, he could have transferred the audio file back to his player and listened to all or part of it but he chose not to. (DE 126-1, at 44 Line 11-20, at 52 Line 9-25, at 53 Line 1-2);

The portion of the audio file that Plaintiff heard told him that by purchasing music he agreed to all of the terms and conditions of the PROGRAM. If he did not wish to be bound by the TERMS, he could elect not to purchase any songs. Plaintiff nevertheless decided to buy songs. (DE 126-1, at 44 Line 21 through 47 Line 8).

Plaintiff further admitted that he did not author the digital music at issue, he does not have a copyright to any of said music, nor has he had the copyrights to any of the music assigned to him. (DE 126-1, at 50 Line 1-13).

While Plaintiff had possession of the digital player, he could have allowed his cellmate to listen to the music on the player. After he mailed the player to his uncle, his uncle could have listened to the music on the player, as could anyone else that his uncle allowed. (DE 126-1, at 51 Line 7-24).

Since relinquishing his digital player, Plaintiff has received a free digital tablet and $75.00 in credits. He used the credits to purchase digital music for his tablet. (DE 126-1, at 55 Line 24 through 56 Line 24; at 57 Line 24 through 58 Line 1).

9

**B.**
**CARLA KNYSACK**

Carla Knysak was responsible for the management and oversight of the PROGRAM as the Director of Operations for ACCESS. She thus enjoys the only undisputed personal knowledge as to the nuances thereof.

Ms. Knysak has verified that none of the digital music purchased by DOC inmates has been "lost"; it is all available for retrieval by any inmate who wishes to have his or her music downloaded onto a CD-ROM (DE 95-1). The CD can then be mailed to any designated individual outside DOC institutions (DE 95-1).

All inmates were provided the TERMS, and if any inmate did not wish to be bound by them, they could have opted not to purchase digital music (DE 95-1, Paragraph 10). If an inmate purchased a digital player before having heard the audio file and then decided they did not want to agree to the TERMS, ACCESS would refund the cost of the player, accessories bought, and any prepaid music credits (DE 95-1, Paragraph 11).

Pursuant to the TERMS, DOC could restrict inmate use of purchased digital music including the removal of music from an inmate's account and/or blocking inmate access to some or all of the purchased digital music without compensation (DE 95-1, Paragraph 12).

10

All inmates had the option of mailing their players to ACCESS, making the players fully operational and rendering all digital media thereon accessible to those in possession of the player.

Another option was to have all purchased digital music stored on the ACCESS server or on the digital players transferred to CD-ROM (DE 95-1, Paragraph 16).

## C.
## KASEY BICKLEY

Kasey Bickley is the Chief of Procurement for DOC overseeing purchasing and contract administration since 2015 (DE 126-2, at 5 Line 9 to 6 Line 13.  During the PROGRAM and after its termination, the transfer of inmates' music from ACCESS to the replacement digital tablets was discussed on multiple occasions with ACCESS and the new vendor ( "JPAY") to determine if the transfer of music was technologically feasible (DE 126-2, at 28 Line 5 to 32 Line 24).  It was eventually determined that the transfer of music was not technologically feasible.

ACCESS couldn't and wouldn't transfer any inmate music purchases to JPAY.  Transfer was impossible due to licensing issues inherent to the digital music and ACCESS would not transfer the music even if it was paid to do so (DE 126-2, at 32 Line 21 through 36 Line 3; 42 Line 2 through 43 Line 7).

JPAY was willing to ingest ACCESS music files onto inmate tablets if ACCESS had been willing to transfer the music.  However, ACCESS would only agree to transfer the music onto CD-ROM and provide the CD to inmates, i.e. the purchaser.

ACCESS would not provide any CD-ROMS to JPAY because JPAY was not the purchaser.  In any event, it was not technologically possible for JPAY to ingest the magnitude of CD-ROMS containing music files onto each inmate's individual tablet (DE 126-2, at 50 Line 13 through 56 Line 11; 60 Line 22 through 62 Line 14).

### D.
### JOHN BRYANT

As DOC's Operations Manager for the Bureau of Contract Management, John Bryant verified that at no time did DOC author, prepare, draft, compose, or create any of the advertisements, order forms, user guide, or any other written material upon which Plaintiff allegedly relied upon for the purchase of digital music (DE 134-1 at 2).

DOC's *only* involvement with these written materials prior to posting or dissemination was to review them exclusively for security related issues but not for content in any manner that would render DOC responsible for the alleged promises made therein (DE 134-1 at 2).

Mr. Bryant has also established that at no time did DOC ever make any promises of any kind to inmates with regard to the PROGRAM.  He specifically contradicts Plaintiff's unsupported assertion that DOC promised inmates that they would "own" purchased music, that they would "own" it "forever", or that they would acquire any form of ownership of the music they purchased (DE 134-1 at 2, 3).

Finally, Mr. Bryant confirmed that at no time during the existence of the PROGRAM did DOC ever make any promises to inmates that they would be able to use purchased music for any specified period of time, during their entire length of incarceration, or during the entire time any inmate was incarcerated (DE 134-1 at 3).

## E.
## THE UNDISPUTED TERMS OF THE PROGRAM

The ACCESS PROGRAM was governed by contractual terms and conditions (the TERMS) to which all participants agreed to be bound by purchasing digital music.

The TERMS contradict Plaintiff's assertions that inmates were promised permanent or unrestricted ownership of purchased digital music files. Inmates were advised that conditions of their incarceration could result in the imposition of restrictions on their music files, including the removal or blocking of digital music file access without any

13

compensation or credit to prison accounts (DE 56-1 at 2). Further, the availability of digital music files was subject to change at any time without notice (DE 56-1, Page 5).

The TERMS also made it clear that after purchasing digital music files inmates did not acquire ownership of the digital music (DE 56-1, at 2). Digital music files were owned by ACCESS, its licensers, or the content owners (DE 56-1 at 2). By purchasing digital music files, inmates only acquired a nonexclusive, nontransferable right to use the digital music files, as limited or otherwise restricted by the provisions of the TERMS (DE 56-1 at 3).

## IV.
## ARGUMENT

### A.
### NO PROMISES WERE MADE TO INMATES AS TO OWNERSHIP OR ACCESS TO MUSIC

In previously denying summary judgment to DOC (DE 64), the Court indicated that the record was devoid of evidence that would negate the existence of promises allegedly made to Plaintiff by DOC as to ownership of the music and/or permanent access to it. The record now establishes that no such promises were made, eliminating this as a reason for denying summary judgment in favor of DOC.

14

Mr. Bryant has established that at no time did DOC ever make any promises to inmates with regard to the PROGRAM.  He also contradicts Plaintiff's untenable assertion that DOC promised inmates they would "own" purchased music, that they would "own" it "forever", or that they would acquire any form of ownership of the music they purchased (DE 134-1 at 2, 3).

In addition, DOC never promised inmates that purchased music would be available to them for the duration of their confinement.  Such claims are based exclusively on Plaintiff's **assumption**[11] that since none of the materials provided by DOC informed him that his purchases would only be available during the span of DOC's contract with ACCESS, the music would be available to him throughout the duration of his incarceration[12]. (DE 1, Paragraph 32 and 34).  Plaintiff also **assumed** that because neither DOC's internal rules nor regulations allegedly informed him that his music files would only be available during the lifespan of DOC's contract with ACCESS,

---

[11] Assumptions are nothing but conjecture, they are not facts, and they cannot serve  as a basis for supporting a claim.  *Davis v Self*, 547 Fed.Appx. 927, 934 (11th Cir. 2013); Prosper v. DOC, 2010 WL 1380374. *4 (N.D. FL 2010)

[12] This assumption is contradicted by the TERMS made known to Plaintiff before he decided to purchase any music.

his music would be available to him during the entire length of his incarceration[13] (DE 1, Paragraph 33).

Mr. Bryant also confirms that at no time during the existence of the PROGRAM did DOC ever make any promises to inmates that they would be able to use purchased music for any specified period of time, during their entire length of incarceration, or during the entire time any inmate was incarcerated (DE 134 at 3).

Coupled with the provisions of the TERMS, the undisputed evidence establishes that inmates were made aware that they could be denied access to some or all of their purchased music at any time by either ACCESS or DOC (DE 32-1).

Failing to directly tie DOC directly to any promises supposedly made to inmates, Plaintiff has tried to impute ACCESS' alleged promises to DOC by attempting to create an agency relationship between DOC and ACCESS. But, when this agency relationship is disadvantageous[14] to Plaintiff, he denies that such a relationship existed.  Plaintiff cannot base his claims on

---

[13] An assumption that is belied by the realities of incarceration, of which Plaintiff was intimately aware, where any inmate's property can be taken away at any time for a variety of reasons.

[14] Such as attempting to prevent DOC from enforcing the provisions of the TERMS as ACCESS' principal.

16

the existence of a supposed relationship while simultaneously denying its existence.

In his Complaint, Plaintiff alleges that DOC acted through the acts of its agents (DE 1, Paragraph 14) and that ACCESS acted on behalf of, and at the direction of, DOC (DE 1, Paragraph 22). He attempts to buttress this position by testifying that if ACCESS did something pertaining to the PROGRAM, it was the same as if DOC had done it because ACCESS was acting on behalf of DOC (DE 126-1 at 41 Line 17-25; at 42 Line 1-20). He then doubles down on the existence of this agency relationship, stating that, "...Access Corrections contracted with the FDOC to provide the Digital Music Player Program, and was therefore FDOC's agent for this purpose and acted on FDOC's behalf for this purpose...." (DE131-2, Interrogatory No. 1).

In the next breath, Plaintiff denies the existence of the agency relationship. In responses to DOC's Request for Admissions, Plaintiff denies that ACCESS ever acted as an agent of DOC and further denies that ACCESS' conduct/acts are imputed to or binding on DOC as they relate to the PROGRAM. (*See* DE 132-1, RA's 1-9 at 2-3).

Plaintiff cannot bind DOC to ACCESS through an alleged agency relationship when it suits him and simultaneously disavow its existence. Because of these inherently conflicting position, the Court must reject the

alleged existence of an agency relationship between DOC and ACCESS for purposes of binding DOC to any promises ACCESS may have made to inmates.

Aside from an agency relationship, the only other possible manner for Plaintiff to bind DOC to the promises allegedly made by ACCESS is by asserting that DOC "published" the written materials that induced his participation in the PROGRAM (DE 1, Paragraphs 22, 27, 28, and 31). This contention is based solely on Plaintiff's alleged "experience" that DOC staff "closely monitor" and "approve" the content of notices posted in institutions[15]. Based solely on this "experience", Plaintiff claims that DOC is bound by all the representations contained therein because by posting/disseminating the written materials, it "published" the materials.

The fallacy in Plaintiff's contention is that Plaintiff is incompetent to opine as to how DOC monitors or approves the content of written material. The only competent evidence as to this issue comes from Mr. Bryant who has verified that DOC did not author, prepare, draft, compose, or create any of the advertisements, order forms, user guide, or any other written material upon which Plaintiff allegedly relied upon for the purchase of digital music (DE 134, Page 2). DOC *only* reviewed ACCESS' materials for security

---

[15] DE131-2,  Interrogatory No. 1

related issues and certainly not for content in any manner that would render DOC responsible for the alleged promises made therein (DE 134, Page 2).

Ironically, Plaintiff has even admitted to having no proof whatsoever that DOC "published" any of the advertisements upon which he bases his claims (DE 126-1 at 42 Line 22 to 43 Line 7).

Since there is no proof that DOC "published" the written materials and the only competent evidence indisputably establishes that DOC did not "publish" the written materials in such a way as to bind it to any promises made therein, DOC cannot be deemed to have made the promises to inmates simply through the act of posting or disseminating ACCESS' written materials.

Finally, the TERMS conclusively establish what inmates acquired through their music purchases and refute any notion that inmates were promised perpetual or unrestricted ownership of digital music files.

The TERMS clearly specify that the purchase of music would not result in inmate ownership thereof, and that use of the digital music purchased could be restricted at any time and for reasons solely within the discretion of ACCESS or DOC.  These restrictions include the removal of purchased digital music files from inmates' digital music collection, the blocking of inmate access to any or all of their digital music, and the

restriction/elimination of the availability of digital music files at any time without any notice.

## B.
## INMATES HAVE NOT "LOST" ANY MUSIC

In previously denying summary judgment to DOC (DE 64), the Court expressed concern that the record did not refute the allegation that inmates may have lost some of their purchased music forever because it no longer exists on the ACCESS server.  The record now establishes that no music has been lost, eliminating this as a reason for denying summary judgment.

Through confusing, unsupported allegations, Plaintiff deluded the Court into believing that some of the digital music stored on the ACCESS server may have been "lost forever" and/or that inmates had no means of retrieving all of their music files so they could send them to designated persons outside the institutions (DE 1 Paragraph 45).

These  assertions were not based on personal knowledge and are contradicted by the undisputed facts.

It is undisputed that every song purchased by inmates is presently stored on ACCESS' servers and it is all readily available for transfer to CD-ROM by inmates (DE 95-1, Paragraph 19).  Moreover, inmates such as

Plaintiff who stored all of their music on their players[16] have all of their music intact, none was "lost", and thus it was all subject to being sent to individuals outside of institutions.

Despite Plaintiff's attempt to have this Court believe that he "lost" music that he did not have stored on his player, Plaintiff has not lost any of his music. All of his music was stored on his digital player when he mailed it to his uncle and it is all currently stored there (DE 95-1, Paragraph 25; DE 126-1 at 29 Line 5-8).

## C.
## DOC IS ENTITLED TO SUMMARY JUDGMENT
## AS TO DIGITAL MUSIC PLAYERS

DOC is entitled to summary judgment as to the physical players[17].

Plaintiff's complaint makes it impossible to discern whether his claims include relief for the dispossession of digital music players but the issue has been cleared up during the litigation process.   In a Reply Memorandum filed

---

[16] To put this into context for the Court, over 95% of currently-incarcerated inmates were likely successful in mailing all of their music to those on the outside. Only 1,205 of them purchased more songs than what could be stored on the smaller capacity MP3 Player (See Exhibit "1"). Inmates who bought fewer songs than the storage capacity of their players, like Mr. Demler, had no reason not to keep all their music on their players and thus when they mailed their players, all their music was mailed out.

[17] Solely for purposes of this argument, a distinction is drawn between the digital music players and any digital music files stored therein.

on December 2, 2019, Plaintiff conceded that ***none of the claims he makes***

***are based upon the loss of any inmates' digital music player***:

> "First, Mr. Demler notes that **his claims** in this matter
> **do not involve Defendant's decision to confiscate**
> **Mr. Demler's or any inmate's digital media *player***,
> and **instead only involve the confiscation of**
> **digital media *files*** without just compensation."

DE 86, Page 8
(Emphasis added
and in original)

Since there is no dispute that neither the purchase, ownership, nor

loss of use with regard to inmates' digital music ***players*** forms any part of

the claims being litigated, summary judgment is warranted as to any and all

issues involving the players.

### D.
### SUMMARY JUDGMENT IS WARRANTED AS
### TO THE MUSIC STORED ON DIGITAL PLAYERS

DOC is entitled to summary judgment as to any and all digital music

files contained on inmates' digital music players, as distinguished from any

digital music files stored externally on ACCESS' server.

In denying DOC's first Motion for Summary Judgment (DE 64) the

Court relied upon certain representations made by Plaintiff in his Complaint

and in a subsequent Declaration.  In both of these documents, Plaintiff led

this Court to believe that when the PROGRAM was terminated he lost access

to previously purchased music that he did not have on his player, but supposedly stored on ACCESS' remote system (DE 1 at 14; DE 40-1 at 7). Plaintiff told the Court that this music was, "...simply gone forever." (DE 1 at 13).

In the absence of evidence to refute the allegation, the Court concluded that Plaintiff some of Plaintiff's music was permanently lost:

> "...[T]he record suggests that, contrary to its argument, ***the Department's new policy will not allow Mr. Demler to send all the disputed property to relatives*** outside the facility. See Demler Decl., ECF No. 40-1 at 7; see also Compl., ECF No.1 at 14. ***The MP3 player stores some of Mr. Demler's purchased music. But the MP3 player's capability is limited. Some of Mr. Demler's purchased music is stored not on the MP3 player but on the cloud.***"

> DE 64 at 8
> (Emphasis added)

Despite making the foregoing allegations, Plaintiff knew that all of his music was safely stored on his MP3 Player and that he successfully mailed all of his 335 digital music files to his uncle.  Plaintiff admitted this during his deposition (DE 126-1 at 29 Line 5-8; *See also* DE 132-1, RA's 135 at 47) and Ms. Knysak has confirmed it (DE 95-1 at 6).

The foregoing undermines a critical aspect of Plaintiff's case.  None of the music inmates stored on their digital players has been lost.  It was all

successfully mailed to persons outside institutions.   That means that the overwhelming majority of inmates successfully mailed all of their music to family members or others outside their institutions[18].

This Court has implied that summary judgment may be warranted as to any music stored on players that were successfully mailed to family or friends.   That translates to summary judgment as to Plaintiff's individual claims since he stored all music on his player and successfully mailed it to his uncle.  It also translates to summary judgment as to the overwhelming majority of inmates who stored all their music on their players and were also able to successfully mail it to family or friends.

### E.
### SUMMARY JUDGMENT IS WARRANTED
### AS TO ALL DIGITAL MUSIC

DOC is entitled to summary judgment as to all claims involving all digital music files purchased through the PROGRAM.

Inmates have not been deprived of property ownership nor of a constitutionally recognized property interest as a result of the termination of the PROGRAM.  Inmates continue to retain whatever ownership interest they ever had in their digital music files.

---

[18] And as Exhibit 1 establishes, over 95% of incarcerated inmates likely kept all of their music on their players and were thus able to successfully mail all of their music outside their institutions.

The only property interest inmates acquired through their purchases was a limited, revocable license to use the music. Licenses, and more specifically limitations on their use, do not give rise to constitutionally protected property interests that are vested in inmates nor redressable through 42 U.S.C. § 1983. Even if that weren't the case, there is no constitutional infirmity in depriving the owner of property, or a license, of some of its value.

In denying DOC's initial Motion for Summary Judgment, the Court expressly recognized that this case does not involve music that is "owned" by inmates[19]. It then boiled the case down to one issue, to wit: whether DOC may constitutionally dispossess inmates of a license that allows them to play their music while incarcerated.

Lest there be any doubt as to whether inmates ever owned the digital music they purchased, the record amply supports the Court's view that they did not.

 The Copyright Act of 1976[20] governs the ownership of the digital music. It provides that the sole owner(s) of musical compositions is/are the

---

[19] "[T]his case involves...*__a license to play music that is not otherwise owned__*." (DE 64 at 7, Emphasis added).

[20] 17 U.S.C. §§ 101-1332 (2012)

author(s) of the works or those to whom the copyright has been transferred. Plaintiff has admitted that he did not author the digital music at issue nor has the copyright for the digital music been transferred to him (DE 126-1, at 50 Line 1-13).  A non-exclusive license to use a musical composition does not constitute a transfer of ownership as a matter of law.  See, e.g., *Pamfiloff v. Giant Records, Inc.*, 794 F.Supp. 933, 939, n.1. (N.D. Cal. 1992).

In addition to copyright law, Paragraph 5 and Paragraph 8 of the TERMS provides that the content owners and licensors retain all ownership rights to the digital music at issue.

Accordingly, inmates never "owned" the digital music they purchased. As part of the purchases they made, they only acquired a limited license to use the music.

No property rights are created by permits or licenses such as those herein.  *United States v. Fuller*, 409 U.S. 488, 493 (1973); *Alves v. United States*, 133 F.3d 1454, 1457 (Fed.Cir. 1998).  "The rights to sell, assign, or otherwise transfer are traditional hallmarks of property."  *Loretto v. Teleprompter Manhattan CATV Corp.*, 458 U.S. 419, 435-36 (1982).  The right to exclude others is another factor, "...in the bundle of rights that are commonly characterized as property."  *Kaiser Aetna v. United States*, 444 U.S. 164, 176 (1979).

If a license can be suspended, revoked, modified, limited, or terminated without compensation to the license holder, that renders it a revocable license instead of a property right. *Conti v. United States*, 291 F.3d 1334, 1341 (Fed. Cir. 2002).

In the instant case, inmates only acquired a revocable license to use the music. This license was subject to restrictions, limitations, suspension, modification, and even revocation as set forth in the TERMS[21]. These licenses were not transferrable; they could not be sold or assigned by inmates; and there was no exclusivity attached to them.

This Court has previously recognized that the licenses at issue cannot be sold or transferred. "Downloaded music of the kind at issue, in contrast, ***cannot be sold***; the right to use the music is all there is, and ***the right is not transferrable***." DE 64 at 7.

Therefore, this case does not involve a property right such that dispossession thereof, or a diminution in its use, gives rise to constitutional redress pursuant to the Fifth Amendment's Takings Clause. *See Conti*,

---

[21] In *Rodriguez v JPay, Inc.*, Case No. 19-14137-Civ-Rosenberg/Maynard, (S.D. Fla.), the Magistrate expressly determined that the availability of digital music and/or inmate access to it could be restricted, limited, or removed at any time, and in some instances without compensation. DE 94 at 11-12. That determination was adopted by the Court. (DE 101).

*supra*;  *Hawkeye Commodity Promotions, Inc. v. Vilsack*, 486 F.3d 430, 440 (8th Cir. 2007); and *Mohlen v. United States*, 74 Fed. Cl. 656, 660 (2006).

Nor do these licenses serve as a basis for Fourteenth Amendment claims.   The Fourteenth Amendment is limited to fundamental rights grounded in the United States Constitution, not interests or rights created by state law.  *Busse v. Lee County, FL*, 317 Fed.Appx. 968 (11th Cir. 2009). The use of a license is an interest created by state law, and is therefore not a fundamental right grounded in the Constitution. *Newark Cab Association v City of Newark*, 901 F.3d 146 (3rd Cir. 2018); *Pro-Tex Contracting & Equipment Sales, Inc.*, 2008 WL 11440561 (M.D. FL 2008). That obviates any claims Plaintiff makes based upon substantive due process.

_____

Arguably, inmates acquired an interest in the licenses they purchased.  Even if it could be argued that this interest amounts to a property right, they still enjoy whatever ownership they acquired.

At best, DOC's conduct only resulted in a ***possession*** restriction that did not affect ***ownership***.   This is a significant constitutional distinction that prevents relief even if the Court finds that inmates acquired a property right through the music purchases.

28

This has Court has previously recognized that inmates can be constitutionally dispossessed of personal property that they were previously permitted to possess (DE 64 at 6). Case law takes this several steps further.

Several Courts have held that inmates are not deprived of substantive due process when they are required to send property to an address outside the prison. Their ownership of the item(s) is not deprived because they still retain the requisite control of the item(s), negating constitutional violations. *Williams v. Meese,* 926 F.2d 994, 998 (10th Cir.1991); *Hatten v. White*, 275 F.3d 1208 (10th Cir. 2002); *Searcy v. Simmons*, 299 F.3d 1220 (10th Cir. 2002); *Stringer v. DeRobertis*, 541 F.Supp. 605 (N.D. Ill. 1982); *Sorrentino v. Godinez*, 2013 WL 5497244 (N.D. Ill. 2013); *Nevada Department of Corrections v. Cohen*, 581 F.Supp2d 1085 (D. Nev, 2008); and *Pryor-El v. Kelly*, 892 F.Supp 261 (D.D.C. 1995).

In denying DOC's first Motion for Summary Judgment, the Court sought to distinguish the foregoing cases by noting that:

> "Here, the Department participated in the sale of the property to inmates, represented to inmates that they would be allowed to use the property in the facility permanently, and took a cut of the sales price. Or so Mr. Demler asserts. None of the Department's cited cases involve similar facts."

(DE 64 at 6)

The Court may have overlooked the fact that at least two of the cases cited, *Searcy* and *Sorrentino*,  involved inmate purchases from institutional commissaries[22].  Therefore, in both instances, the correctional institutions were as involved in sales as DOC was herein and similarly profited from the sales, making the cases cited identical to the instant case.

As for the distinction that DOC allegedly made representations to inmates regarding permanent use of the music while in prison, the undisputed facts convincingly established that DOC never made any such promises.  That removes this distinction as a consideration.

Just as Plaintiff does herein, Searcy claimed that by being dispossessed of his property and being forced to mail it to relatives, his constitutional due process rights as to property ownership were violated. The Court found that no such violation had resulted because even though Searcy had to mail the property to relatives and could no longer use it while incarcerated, he was still the owner of the property.  *Searcy*, at 1229. "[T]here is a difference between the right to **_own_** property and the right to **_possess_** property while in prison...." the Court added.  The act of sending the property to relatives, "...**_did not deprive Mr. Searcy of ownership_**

_____

[22] *Searcy* involved the purchase of a typewriter, a fan, and a radio from the commissary.  *Sorrentino* involved the purchase of $300 in items from the commissary.

of the property." *Searcy* at 1229 (Emphasis added).  *See*, also *Wenzler v. Warden of G.R.C.C.*, 949 F.Supp. 399 (E.D. Va. 1996).

The distinction between ownership and possession of property is equally dispositive of any Fifth Amendment Takings Clause claims.  See *Cohen, supra*; *Kelly*, supra; *Savko v. Rollins*, 749 F.Supp. 1403 (D. Md. 1990); and *Stringer v. DeRobertis,* 541 F.Supp. 605, 606 (N.D.Ill.1982).

The Court also attempted to distinguish *Sorrentino*, but it is indistinguishable to the extent the undisputed facts have resolved any of the distinctions the Court drew between it and the case at hand.

The first distinction the Court drew was that this case involved alleged promises made to inmates that they would be able to possess their music permanently (DE 64 at 8).  The undisputed facts now establish that no such promises were ever made.

The second distinction the Court drew was that unlike the plaintiff in *Sorrentino*, Plaintiff was unable to mail all of his music to his uncle because not all of his music was stored on his player.  The Court also believed that any music Plaintiff stored "in the cloud" was permanently lost.

The undisputed facts now establish that Plaintiff mailed all of his music to his uncle as all 335 songs he purchased were stored on his player when he mailed it.  Further, no inmate has lost any music whether it was stored on

players on or ACCESS servers.

Finally, and most important of all, the Court distinguished *Sorrentino* on the basis that the case at hand involves a possible constitutionally prohibited taking because, unlike *Sorrentino*, inmates here may have been deprived of all of their property's value.  Relying on *Stop the Beach Renourishment, Inc. v. Fla. Dep't of Envtl. Prot.*, 560 U.S. 703, 713 (2010) and *Lucas v. S.C. Coastal Council*, 505 U.S. 1003, 1019 (1992), the Court noted that a taking may occur when the state deprives someone of all economically beneficial use of his property.

Before a Court can decide if a prohibited taking has occurred, a constitutionally recognized property interest must exist.  *M & J Coal Co. v. U.S.*, 47 F.3d 1148, 1153-54.  As a matter of law, the licenses acquired by inmates in the case at hand are not constitutionally recognized property[23]. Therefore, there can be no taking.

But even if the use of these licenses involves constitutionally protected property right, inmates have not been deprived of "all" of the licenses' value nor "all economically beneficial use" of the music as required by the cases cited by the Court.

First, by the Court's own recognition, the licenses at issue have no

---

[23] See discussion at Pages 28-30.

economic value.  The Court has noted that the music cannot be sold and the license is not transferrable.  To that extent, DOC cannot have deprived inmates of all, let alone some, of the licenses' economic value, or its economically beneficial use, since the licenses have no economic value.

Moreover, in order to constitute a taking, one must be deprived of all other use of the property.  In other words, if the property can be put to other use, there is no constitutional taking. *Conti v. U.S.*, 291 F.3d 1334 at 1344.

In the case at hand, inmates have mailed their players with thousands of songs to family and friends who can listen to that music any time.  Since these family members or friends will not have to otherwise purchase that music, an economically beneficial use to them has resulted.  This satisfies the *Stop the Beach* and *Lucas* requirements as well as *Conti's* holding that negates a taking when the item has been put to "other use".

In addition, inmates can have all of their stored digital music from ACCESS' server downloaded onto a CD-ROM and mailed to family or friends.  Those persons can listen to the CD's at home, in their vehicles, or upload them to digital forums (e.g., iTunes) where they can then be played.  That results in economically beneficial use of the inmates' music that also puts the music to other use.

According to this Court, the only value inherent to the licenses is the ability to use the music (DE 64 at 7).  Plaintiff has admitted that he mailed his player with 335 songs to his uncle and that as a result his uncle could listen to the music (DE 126-1, at 51 Line 7-24).  Further, his uncle could allow anyone else to use the player and listen to the music.  That Plaintiff may not be able to  listen to the music is not the criteria to be used in deciding whether a taking has taken place.  The test is whether *all* value and *all* economically beneficial use has been eradicated.  That bar has not been cleared based on the undisputed facts of this case. As a result, no takings claim exists.

**F.**
**ABSENCE OF UNAMBIGUOUSLY CONFERRED RIGHTS**

In an action brought pursuant to 42 U.S.C. § 1983, Plaintiff must satisfy two prerequisites:   1) that the conduct of which he complains was committed by a person acting under color of state law; and 2) that such conduct deprived him of rights, privileges, or immunities secured by law or the Constitution of the United States.  *Blessing v. Freestone*, 520 U.S. 329, 340 (1997); *Burban v. City of Neptune Beach, Florida*, 920 F.3d 1274 (11th Cir 2019);  *Evans v. Echeverri*, 2010 WL 144987 (N.D. FL 2010).  Anything short of an unambiguously conferred right will not support a 42 U.S.C. § 1983 cause of action.  *Gonzaga University v. Doe*, 536 U.S. 273, 282-283 (2002).

Plaintiff claims that he had a constitutionally protected property right

in his purchased digital media files.  However, as previously established, inmates only obtained a limited license to use the music files purchased. These licenses do not create property rights protected by the Constitution (*See* Pages 28-30 herein).   Consequently, Plaintiff's claims cannot involve unambiguously conferred rights as required by law so as to warrant relief.

### G.
### DOC'S CONDUCT DOES NOT SHOCK THE CONSCIENCE

For conduct to rise to a violation of substantive due process, the conduct must be arbitrary, oppressive in the constitutional sense, and, "...so egregious, so outrageous, that it may fairly be said to shock the contemporary conscience." *County of Sacramento v. Lewis*, 523 U.S. 833 at 847 n. 8 (1988).   *See also*, *Daniels v. Williams*, 474 U.S. 327 (1986); *DeShaney v. Winnebago Cty. Dep't of Soc. Servs.*, 489 U.S. 189 (1989); *Maldonado v. Fontanes*, 568 F.3d 263 (1st Cir. 2009); and *Tanney v. Boles*, 400 F.Supp.2d 1027 (E.D. Mich. 2005).

Alleged constitutional violations do not, in and of themselves, "shock the conscience". *Romans v. Velleca*, 2012 WL 4445475 (D.Conn. 2012) at *10.   Neither do inmate allegations of property deprivation. *Booth v. King*, 346 F.Supp.2d 751 (E.D. Pa. 2004); and *Newman v. Coats*, 2009 WL 1260020 (E.D. Mich. 2009).  This is especially the case

when, as in the case at hand, inmates have been afforded an opportunity to mail the property to someone outside of the institution.  *Morefield v. Smith*, 404 Fed.Appx. 443, 445 (11th Cir. 2010).

Applying the foregoing law, DOC's conduct in the case at hand was not arbitrary, oppressive in the constitutional sense, nor something that is so egregious or so outrageous that it shocks the conscience sufficiently to violate Plaintiff's substantive due process rights.

**H.**
**ENFORCEMENT OF THE TERMS NEGATES RELIEF**

The final argument in support of summary judgment is that the TERMS permit the dispossession of music that occurred herein.

The Court has already determined that if Plaintiff agreed to the TERMS and is bound by them, assuming they authorize the dispossession of the digital music, he has no viable claims (DE 64 at 8,9).

That Plaintiff agreed to the TERMS and is bound by them has been conclusively established.  He admitted to listening to that portion of the TERMS' audio file advising him that by purchasing music, he agreed to all of the terms and conditions of the PROGRAM.  Further, he was apprised that if he did not wish to be bound by the TERMS, he could elect not to purchase any songs.  Plaintiff nevertheless decided to buy songs.  (DE 126-1, at 44 Line 21 through 47 Line 8).  He is therefore bound.

36

As to whether the TERMS authorize the dispossession of music so as to negate any claims, the Court need only look to Judge Rosenberg's adoption (DE 101) of Judge Maynard's Report and Recommendation (DE 94) in *Rodriguez v JPay, Inc.*, Case No. 19-14137-Civ-Rosenberg/Maynard, (S.D. Fla.) wherein Judge Maynard found that the provisions of the TERMS are unambiguous; inmates were not promised permanent ownership of or access to the purchased music; the music was not owned by inmates but rather by the content owners; and that both ACCESS and DOC could remove, restrict, or block inmate access to any or all of their music purchases without compensation (DE 94 at 10, 11).

The TERMS provide that Missouri law governs disputes involving the TERMS.  In Missouri, if contractual provisions are clear and unambiguous, contracts are enforced as written.  *Mazurkiewicz v. Country Mutual Ins. Co.*, 978 F. Supp.2d 1003, 1006 (E.D. Mo. 2013) (citing *Lynch v. Shelter Mut. Ins. Co.*, 325 S.W. 3d 531 (Mo. Ct. App. 2010).  Judge Maynard and Judge Rosenberg both concluded that these TERMS are both.

When the language addresses the matter at issue, the inquiry ends. *TAP Pharm. Prod. Inc. v. State Bd. Of Pharmacy*, 238 S.W.3d 140, 143 (MO. Banc 2007).  In the case at hand, the TERMS address every key aspect of the matters at issue in this case.  The inquiry should thus end.

Enforcing the TERMS negates Plaintiff's claims as well as that of all inmates. DOC urges their enforcement in support of summary judgment.

## V.
## CONCLUSION

For the reasons set forth above, Defendant respectfully requests that the Court enter summary judgment in its favor.

## VI.
## CERTIFICATE OF COMPLIANCE WITH LOCAL RULE 7.1(f)

I hereby certify that this Motion and incorporated Memorandum of Law contains 7,943 words, exclusive of case style, signature block, and certificate of service.

Respectfully submitted,

**ASHLEY MOODY**
**ATTORNEY GENERAL**

*/s/* Miguel A. Olivella, Jr.
MIGUEL A. OLIVELLA, JR.
Senior Assistant Attorney General
Fla. Bar No. 253723
Office of the Attorney General
Complex Civil Litigation Division
The Capitol - PL 01
Tallahassee, FL 32399-1050
(850) 414-3817
Miguel.Olivella@myfloridalegal.com

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on this 3rd day of March, 2020 I

electronically filed a true and correct copy of the foregoing with the Clerk of

Court using the CM/ECF system, which will transmit a copy to all counsel of

record registered with the Court.

*/s/* Miguel A. Olivella, Jr.
MIGUEL A. OLIVELLA, JR.
