## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF FLORIDA
### Tallahassee Division

WILLIAM DEMLER, individually,
and on behalf of all others similarly situated,

      Plaintiff,

vs.                                                  Case No. 4:19-cv-00094-RH/GRJ

MARK S. INCH, in his official capacity as
Secretary of the Florida Department of
Corrections,

      Defendant.

_____/

### PLAINTIFFS' CORRECTED MOTION FOR SUMMARY JUDGMENT

Plaintiffs, William Demler, Wayne Pula, and Michael Gisi,[1] by and through

undersigned counsel, hereby move for summary judgment. The material facts

necessary to grant summary judgment in Plaintiffs' favor are undisputed. The

Florida Department of Corrections (FDOC) sold media players and digital songs to

prisoners and collected commissions on those sales. After years of encouraging

prisoners to spend millions of dollars through the program by promising permanent

ownership of purchased songs, FDOC switched vendors and confiscated all

previously purchased music, without just compensation. These actions amount to

---

[1] The Court has ordered the Parties "to prepare in the expectation that upon amendment to the complaint, a class will be certified," ECF No. 118 at p. 2. As such, Plaintiff is seeking summary judgment on behalf of Mr. Demler, and the two newly proposed Plaintiffs, as well as the putative class.

violations of the Taking Clause of the Fifth Amendment and the Substantive Due Process Clause of the Fourteenth Amendment.

## STATEMENT OF FACTS

### *Origin and Operation of the Defendant's Digital Music Player Program*

In 2009, FDOC entered into a five-year contract with Keefe Commissary Network, LLC ("Keefe"), to provide for statewide canteen services (Contract #C2562) ("Keefe Contract").[2]   The Keefe Contract called for the provision of inmate canteen services, and included a Master Canteen Products List that listed every product that FDOC would allow to be sold to prisoners.[3]   While this list included two different types of digital radios, it did not originally include any other type of MP3/MP4 or digital music player.[4]

In 2011, FDOC amended its contract with Keefe[5] to provide for a statewide Digital Music Player Program.[6]   Pursuant to this amendment, prisoners would be provided with a secure method by which they could browse, purchase and download digital music files to specialized digital media (MP3/MP4) players[7] made explicitly for use by prisoners in a correctional setting.[8]

---

[2] *See* Ex. 1 at p. 1 (Keefe Contract).
[3] *Id*. at p. 6.
[4] *Id*. at pp. 41-50.
[5] For purposes of the MP3 Player Program, Keefe was doing business as "Access Corrections."
[6] *See* Ex. 2 at p. 3 (Amendment No. 1 to Keefe Contract).
[7] From July 8, 2011, through January 23, 2017, FDOC and Keefe entered into several Amendments to the Keefe Contract.  Initially, the provision of those services was referred to as the MP3 Player Program.  Later, those services were subsequently referred to as the Digital

-2-

Under the Digital Music Player Program, prisoners had the ability to purchase digital music files for use with these specially designed players,[9] using funds from their inmate accounts.[10]   In order to purchase digital music files - available at a cost of $1.70 per song - prisoners were required to purchase blocks of "Prepaid Media Song Credits," which required a minimum purchase of five songs at a cost of $8.50.[11]   There was no limit placed on the number of songs that a prisoner could purchase.[12]

Prisoners purchased these credits using a Media Order Form, available at each FDOC institution, and which was titled prominently as: "Florida Department of Corrections NOW ACCEPTING ORDERS."[13]   Prisoners could then use these prepaid credits by securely connecting their media player to a kiosk at their institution, allowing them to access the MP3/MP4 Player Music Library and download available songs to their media player.[14]

If a prisoner purchased too many songs to fit on the internal storage of their media player, they could also use a kiosk to transfer their purchased music to a

Music Player Program.   The two will be collectively referred to as the Digital Music Player Program for purposes of this Motion.   *See* Ex. 3 at p. 1 (Amendment No. 6 to Keefe Contract).

[8] *Id*.

[9] FDOC prisoners had the ability to purchase one of two specially designed digital media players, for either $99.95 or $119.95, as well as various accessories.

[10] *Id*. at p. 8.

[11] *See* ECF 40-3 (Media Order Form)

[12] *See* Ex. 4 (FDOC Order Form Advertisement)

[13] *Id*.

[14] *See* Ex. 5 at p. 11 (MP3 Player User Guide).

"Re-Order Manager" reserved for their use.[15]   The "Re-Order Manager" would automatically store any song that was purchased and then subsequently deleted, allowing that specific user to "re-order" those songs, at any time, and at no cost.[16] While prisoners could only store the number of songs that would fit within the memory capacity of his or her media player, there was no limit on the number of songs that a prisoner could maintain in their "Re-Order Manager."[17]

In order to actually listen to their purchased music, prisoners were required to connect their media players to one of the kiosks at their institution at regular intervals, in order to extend the device's Security Timer.[18]   If a prisoner failed to, or was unable to, connect their media player to a kiosk every thirty (30) days, the media player would be automatically disabled, in order to prevent fraudulent use of the device as well as its use outside of the FDOC's facilities.[19]

The program also offered an additional service, as an optional purchase, which allowed, "[u]pon release, for $25.00, [to] have all security software removed for long-term enjoyment of your MP3 Player and previously purchased music" - also thereby allowing that music to be copied to a CD[20] - for use by the inmate

---

[15] *Id*. at p. 15.
[16] *Id*.
[17] *Id*.
[18] *Id*. at p. 4.
[19] *Id*.
[20] *See* ECF 56-1 at pp. 2-3 (MP3 Terms of Service)

purchaser outside of prison ("Retention Service").[21]  Without the purchase of the Retention Service, the songs could not be used outside of the prison after the security timer expired.[22]  Therefore, the purchase of the song credits only entitled Plaintiff to access, listen, and use his purchased songs while incarcerated.[23]

### *Defendant Encouraged Participation in its Digital Music Player Program by Promoting Permanent Ownership of Purchased Music*

In order to encourage prisoners to purchase media players and songs, FDOC posted numerous FDOC approved[24] posters and advertisements regarding the Digital Music Player Program throughout FDOC institutions and provided the same to prisoners.[25]

In addition to touting the qualities of the media players themselves, at least one widely distributed advertisement, again prominently titled: "Florida Department of Corrections NOW ACCEPTING ORDERS," also touted various qualities of the songs available for purchase, including the following representation:

> Browse, search and preselect songs from updated music catalogs holding millions of song titles representing a wide array of music genres.  You have the ability to purchase and listen to unlimited music

---

[21] *See* Ex. 6 (MP3 Promotion)
[22] *See* Ex. 5 at p. 43.
[23] *Id*.
[24] *See* Ex. 7 (Rule 30(b)(6) Deposition of FDOC (Carl Wesley Kirkland, Jr.)) at 7:16-7:25; 8:1-8:9.
[25] *See* Ex. 4; Ex. 6.

utilizing the re-download feature free of charge.  **Once music is purchased, you'll always own it**!  (emphasis added).[26]

The user guide that accompanied the media players similarly emphasized the permanent ownership of songs purchased:

> You can delete and re-order songs as often as you want.  You will never be charged for a song that is ordered from the Re-Order Manager.  **After all, you have already paid for the song once; we don't think you should ever have to pay for it again**.  (emphasis added).[27]

Consistent with these representations, none of the materials provided to prisoners regarding the operation of the Digital Music Player Program ever suggested that the songs they purchased would only be available to listen to during the span of the Keefe Contract.[28]  In fact, the only other representation made regarding the length of time that purchased songs would be available for prisoners to listen to was that purchased songs would still be available to prisoners "for long-term enjoyment" _after_ their release from FDOC custody, if they chose to purchase the optional Retention Service.[29]  As such, prisoners purchased these songs specifically to listen to them in prison, and at least for the duration of their incarceration.[30]

---

[26] _See_ Ex. 8 (MP4 Advertisement).
[27] _See_ Ex. 5 at p. 15.
[28] _See_ Ex. 9 (FDOC's Resp. to Pl. Second Interrogatories) at p. 3 (Interrogatory No. 24); ECF 40-1 at ¶ 19 (Declaration of William Demler).
[29] _See_ Ex. 6.
[30] _See_ Ex. 5 at p. 43; ECF 40-1 at ¶ 20.

### *FDOC's Digital Music Player Program was a Financial Success for the FDOC*

Pursuant to the Keefe Contract, FDOC received a commission on every media player, accessory, and song that was purchased by prisoners.[31] Specifically, FDOC received commission payments of $0.20 per downloaded song, $2.00 for each armband, $1.00 for each earbud, and $1.00 for each protective cover.[32]

From 2011 to 2017, FDOC prisoners purchased over six million songs through the Digital Music Player Program.[33] These song purchases cost prisoners over $11 million.[34] The FDOC itself realized over $1 million in commissions on these sales during the same time period.[35] Over the course of the contract, prisoners purchased an average of 300 songs each, at an average cost of roughly $500 per participating inmate.[36]

---

[31] *See* Ex. 1 at p. 11.

[32] *Id*.

[33] *See* Ex. 10 (FDOC's Am. Resp. to Pl. First Request for Admission) at p. 5 (RFA No. 19).

[34] *Id*. (RFA No. 20).

[35] In addition to these commissions, FDOC also received a guaranteed per diem payment under the canteen operation portion of the Keefe Contract, regardless of the amount of gross sales, which equated to payments of roughly $34 million per year to FDOC.

[36] Approximately 20,000 prisoners participated in the Digital Music Player Program and purchased six million songs, averaging 300 songs each. At a cost of $1.70 per song, each prisoner spent approximately $500.

***Defendant Looks for a New Vendor for its Digital Music Player Program and Finds a Solution That Allows Prisoners to Keep Their Purchased Music***

In late 2013, in preparation for the end of the Keefe Contract, FDOC initiated a competitive procurement process to locate a qualified vendor to continue its Digital Music Player Program.[37]

First, in December 2013, FDOC released a Request for Proposal for Contractual Services (Solicitation No. DC RFP-13-024) ("FDOC's 2013 RFP").[38] In addition to requiring that any proposals be "at no cost to the Department and … revenue generating,"[39] FDOC's 2013 RFP explicitly stated that compatibility with FDOC's prior vendor was a <u>mandatory</u> requirement of the contract, in order to ensure that prisoners would not bear the cost of the transition between vendors:

> The Contractor **shall** provide a proposed method with their proposal that will allow inmates who currently have MP3 player and/or songs purchased from the current Contractor to transfer and/or obtain updated equipment and/or music compatible with the awarded Contractor's MP3 player program.  It is the Department's intention that the implementation of the new MP3 player program will have little or no financial impact on inmates currently participating in the MP3 player program.[40]

As a continuation of this process, FDOC subsequently released an Invitation to Negotiate for Contractual Services in July 2014 (Solicitation No. DC ITN-13-

---

[37] *See* Ex. 11 (FDOC Request for Proposal).
[38] *Id*.
[39] *Id*. at p. 8.
[40] *Id*. at pp. 13-14.

034) ("FDOC's 2014 ITN").[41]  Just as in the FDOC's 2013 RFP, the FDOC's 2014

ITN – the very first substantive section, labeled "Statement of Purpose" - explicitly

stated that compatibility with FDOC's prior vendor was a necessity for any

proposal:

> [T]he proposed system **must** allow for inmates who currently have a device and/or songs purchased from the current Contractor to transfer and/or obtain updated equipment and/or music compatible with the successful contractor's Digital Music Player Program.[42]

Following a period of written questions and answers from potential vendors

regarding FDOC's 2013 RFP and 2014 ITN,[43] FDOC received bids from four

different vendors, including Keefe and JPay.[44]

After an initial round of negotiations in September 2014, the FDOC issued a

Request for Best and Final Offers ("RBAFO") on October 3, 2014, which stated

that FDOC would award the Digital Music Player Program contract to the vendor

that provides the "best value" to FDOC, based on FDOC's negotiations with each

vendor as well as a short list of final selection criteria.[45]  Unsurprisingly, this final

list of criteria again noted FDOC's intention to award a contract that had little to no

financial impact on prisoners, specifically listing, "[c]ost to inmates regarding

transfer and/or obtaining an updated digital music player and/or songs compatible

---

[41] *See* Ex. 12 (FDOC Invitation to Negotiate).
[42] *Id*. at p. 5.
[43] *See* ECF 126-2 (Deposition of Kasey Bickley, Feb. 4, 2020) at 12:7-12:17.
[44] *See* Ex. 13 (ITN Bid Tabulation).
[45] *See* Ex. 14 (JPay Formal Protest, Nov. 10, 2014, JPay, Inc. v. FDOC (DOAH Case No. 14-5642BID)) at p. 4.

with the proposed digital music player program," as one of the final selection criteria referenced.[46]

After an additional period of negotiation with all four potential vendors, on October 28, 2014, FDOC made the final decision to award the ongoing MP3 Player Contract to Keefe.[47]    In so doing, FDOC's negotiation team made the determination and recommendation that Keefe's proposal represented the "best value" to the FDOC, taking into multiple factors, including price, quality, workmanship, as well as the ability of the proposed vendor to meet the selection criteria.[48]  Most importantly, the accepted proposal from Keefe satisfied FDOC's repeatedly stated requirement that any new program be fully compatible with the existing Digital Music Player Program, and would have allowed prisoners to keep all of the music that they had previously purchased.[49]  According to FDOC, this was a crucial component of Keefe's proposal, and a reason why Keefe's proposal was ultimately accepted.[50]

---

[46] *Id.*
[47] *Id.* at p. 6.
[48] *See* Ex. 15 (Rule 30(b)(6) Deposition of FDOC (Kasey Bickley), Feb. 27, 2020) at 10:10-10:25; 11:1-11:6; 11:23-11:25; 12:1-12:6.
[49] *Id.* at 16:1-16:10.
[50] *Id.* at 32:4-32:25; 33:1-33:12.

### *Defendant Abandons its Competitive Bidding Process and Contracts with JPay*

Following FDOC's award of the new Digital Music Player Contract to Keefe, FDOC received a Notice of Intent to Protest the Department's intended contract award to Keefe, filed by JPay on October 31, 2014.[51] While there were several procedural reasons for JPay's protest, the main thrust was the allegation that Keefe had been granted an additional negotiation session with the FDOC,[52] and that FDOC should not have considered the cost of transitioning to a different vendor, given JPay's belief that the incumbent vendor, Keefe, was improperly chosen without a competitive solicitation process to begin with, accusing the procurement process of being "tainted by bias and favoritism towards Keefe."[53] [54]

The FDOC investigated JPay's claims and determined that there was no validity to JPay's protest.[55] JPay thereafter filed a Formal Written Protest Petition with the Department of Administrative Hearings (DOAH) on November 10, 2014, raising the same claims as described above.[56]

Then, on January 20, 2015, without a single substantive finding having been made by the DOAH court, FDOC suddenly decided to abandon its position, reject

---

[51] *See* Ex. 14 at p. 7.
[52] *See* Ex. 15 at 8:7-8:25; 9:1-9:6.
[53] *See* Ex. 14 at pp. 9-10; p. 20.
[54] In 2011, JPay also protested the FDOC's 2011 decision to amend the Keefe Contract to include a MP3 Player Program, without soliciting any other bids. *See* Ex. 15 at pp. 147-155 (describing the FDOC's 2011 amendment of the Keefe Contract as "a multi-million dollar, sole source, no-bid contract.").
[55] *See* Ex. 15 at 37:4-37:9.
[56] *See* Ex. 14.

all replies and proposals, and withdraw its intention to award the Digital Music Player Program contract to Keefe.[57]   The FDOC provided no rationale for this sudden reversal in any documents filed with DOAH.  Similarly, the FDOC did not provide any specific rationale or justification for this sudden decision in deposition in the instant case.[58]

Rather than implement its decision to grant the Digital Music Player Contract to Keefe and allow prisoners to keep all of their purchased music – a decision made after more than a full year of costly and time-consuming negotiations with vendors pursuant to FDOC's own competitive procurement process - the FDOC instead decided to participate in a multi-state contract administered by the National Association of State Procurement Officials (NASPO) and the Multi-State Corrections Procurement Alliance (MCPA) ("NASPO Contract").[59]   This procurement method – known as an "alternate contract source" – allows FDOC to essentially "piggyback" on the competitive procurement efforts of another state, and adopt the results of that state's procurement process as its own.[60]   The process then allows other participating states – like the FDOC – to

---

[57] *See* Ex. 15 at 13:8-13:18.
[58] *Id*. at 14:10-14:16.
[59] *See* Ex. 16 (Kiosk Procurement Recommendation) at p. 1.
[60] *See* ECF 126-2 at 19:7-19:25; 20:1-20:14; Ex. 15 at 19:16-19:25.

complete their own "participating addendum/contract" with one or more of the awarded vendor(s), for services specific to their own needs.[61]

The particular NASPO Contract at issue had been awarded to both Keefe and JPay by the State of Nevada.[62]  Thus, beginning in November 2015, FDOC once again re-entered into negotiations with the same two entities with which it had just completed, and then abandoned, its own competitive procurement process.[63]

However, rather than basing negotiations on the criteria set forth in FDOC's own RFP or ITN – such as the requirement that any Digital Music Player contract include provisions for the transfer of previously purchased music so as not to have a devastating financial impact on prisoners – this time FDOC was required to use the NASPO Contract as the starting point of negotiations.[64]  Unsurprisingly, the NASPO Contract contained no such provision or requirement, and made no mention of the compatibility or transfer of previously owned music or the financial cost of any proposed programs on prisoners.[65]

FDOC first met with JPay and Keefe to review their NASPO proposals in November 2015.[66]  During FDOC's meeting with JPay, despite its prior repeated

---

[61] *See* Ex. 16 at p. 1.
[62] *Id.*
[63] *Id.*
[64] *See* Ex. 15 at 58:1-58:4.
[65] *Id.* at 35:17-35:22.
[66] *See* Ex. 16 at p. 1.

insistence regarding the compatibility and transfer of previously owned music, FDOC did not even raise the issue of how JPay proposed to integrate its inmates' previously purchased songs or what the financial impact of JPay's proposal would be on prisoners, nor were these issues discussed.[67]

At some later point, FDOC's negotiations with JPay began to include conversations about the transition to JPay's proposed program from the existing Digital Music Player Program.[68]   Those conversations included two potential solutions to the issue of the prisoners' previously purchased music.

First, FDOC asked JPay if it was technically feasible to transfer prisoners' previously purchased music from their Keefe media players to the JPay tablets.[69] The answer was yes: JPay indicated that if Keefe were able to transfer the music that prisoners had purchased under the Digital Music Player Program, JPay would put that music on each prisoner's tablet for them to listen to.[70]   JPay then offered to contact Keefe to determine if the transfer of the music was similarly feasible from Keefe's perspective.[71]   Shortly thereafter, JPay informed FDOC that Keefe had responded and was unwilling to transfer any of the previously purchased music.[72]

---

[67] *See* ECF 126-2 at 24:10-24:25.
[68] *See* Ex. 15 at 61:6-61:10.
[69] *See* ECF 126-2 at 32:11-32:24.
[70] *Id*. at 50:13-50:17.
[71] *Id*. at 33:1-33:3.
[72] *Id*.

At no point prior to the signing of FDOC's contract with JPay did anyone from FDOC itself contact Keefe to determine if it was possible for Keefe to transfer the previously purchased music to JPay for continued use.[73]  At no point prior to the signing of FDOC's contract with JPay did anyone from FDOC do any additional investigation into whether the previously purchased music could be transferred.[74]  In fact, had FDOC done so, it would have discovered that Keefe was willing to indirectly transfer the previously purchased music to JPay, provided certain conditions were met, as detailed further below.[75]

Instead, FDOC's conversations with JPay regarding how to deal with previously purchased music revolved almost entirely around the negotiation of media credits.[76]  In this vein, according to FDOC's Chief of Procurement, the provision of credits to prisoners who had previously purchased music was treated as nothing more than one of many negotiated terms - a drastic contrast from FDOC's prior insistence that this issue would be a central consideration in the review of any potential vendors.[77]  According to FDOC, the possibility of providing full compensation to prisoners in the form of an equivalent number of music credits was never even discussed.[78]  Instead, FDOC made the internal

---

[73] *Id*. at 36:5-36:10.
[74] *Id*. at 36:22-36:25; 37:1-37:7.
[75] *Id*. at 60:22-60:25; 61:1-61:13.
[76] *Id*. at 26:20-26:25; 27:1-27:8.
[77] *Id*. at 27:16-27:25.
[78] *Id*. at 28:1-28:4.

determination that obtaining or providing compensation for these prisoners was less of a "priority" than other negotiated terms and value-added services,[79] such as the provision of 500 desktop computers (with monitors) every six months for the life of the contract, for use by FDOC officials and employees; 1,500 iPad Air 2 tablets for use by FDOC officers over a three year period; as well as the installation of additional bandwidth infrastructure for FDOC's own administrative use.[80]

Eventually, FDOC and JPay agreed that inmates who had previously purchased music through the Digital Music Player Program would receive a $10 media credit that could be used to re-purchase their previously purchased music.[81] This same $10 incentive was offered to all prisoners who had purchased a media player through the Digital Music Player Program, regardless of the number of songs any particular inmate had purchased.[82]  As such, FDOC and JPay somehow came to this $10 "compromise" even though, as stated earlier, participating prisoners purchased an average of 300 songs each, at an average cost of roughly $500 per prisoner.

In April 2017, FDOC formally entered into its alternative source contract with JPay to provide multimedia kiosks and tablets for use by inmates statewide

---

[79] *Id*. at 27:16-27:25.
[80] *See* Ex. 17 (JPay Proposal Overview) at p. 2.
[81] *See* ECF 126-2 at 27:9-27:15.
[82] *Id*.

(Contract #C2885) ("JPay Contract").[83] Pursuant to the JPay Contract, FDOC now offered two multimedia tablets for sale, for either $79.99 or $129.99 ("Multimedia Tablet Program").[84] Similar to the prior Digital Music Player Program, the Multimedia Tablet Program also allows prisoners to purchase digital music and other files and listen to those files on their tablets, at a cost of $1.00-$2.50 per song.[85] Importantly, the JPay Contract does <u>not</u> require that FDOC inmates relinquish their existing music players or their previously purchased digital music.[86]

### *Defendant Unilaterally Confiscates Digital Music Files Without Compensation*

Following the execution of the JPay Contract in April 2017, although not required by either the JPay Contract or the Keefe Contract, FDOC, in its sole authority, quickly established and enforced a separate statewide policy under which it confiscated <u>all</u> songs that had been lawfully purchased under the Digital Music Player Program ("Digital Music Confiscation Policy").[87] FDOC implemented this policy by forcing prisoners to surrender their media players and then completely rescinding access to all of the music they had lawfully purchased.[88]

---

[83] *See* ECF 71-2 at p. 1.
[84] *Id*. at p. 37.
[85] *Id*.
[86] *See* ECF 71-2.
[87] *See* Ex. 18 (FDOC Confiscation Notice); ECF 40-1 at ¶ 26.
[88] *Id*.

FDOC's first step was to begin posting notices informing prisoners that they would shortly be losing access to all of their previously purchased music, and listing the various dates on which certain events would occur.[89]  Next, in January 2018, FDOC cut off prisoners' access to the purchased songs contained in each prisoner's "Re-Order Manager," allowing prisoners to temporarily keep their media players but preventing them from downloading their own previously purchased music.[90]

Finally, FDOC required all prisoners to surrender their media players completely, including all the songs on the players, to FDOC, by the earlier of January 23, 2019, or the date that they received a new tablet under the Multimedia Tablet Program.[91]  The Digital Music Confiscation Policy applied to all prisoners who participated in the Digital Media Player Program, whether or not they purchased a tablet under the new Multimedia Tablet Program.[92]

The Digital Music Confiscation Policy also announced that participating prisoners were given the option to either (a) surrender their media player to FDOC to be destroyed; (b) mail their media player to Keefe to have the Security Timer removed and mailed to someone outside of prison (for a fee of $24.95); or (c) mail their digital media player to Keefe to have their purchased music transferred to a

---

[89] *Id.*
[90] *Id.*
[91] *Id.*
[92] *Id.*

CD and then have that CD mailed to someone outside of prison (for the same fee).[93] Yet, despite these published options regarding Keefe, FDOC has produced no evidence that any FDOC inmate has actually been able to utilize either proposed solution, or that Keefe has removed any security timers or transferred any inmate's music to a CD pursuant to the Digital Music Confiscation Policy.[94]

In addition to this lack of evidence, these "send-home" options are completely illusory for several other reasons.  First, under the Digital Music Player Program's "Terms of Sale for Permanent Music Downloads," when a participating FDOC inmate purchased a song (a "Permanent Download"), that inmate in fact purchased a "right to use the Permanent Download" (i.e., the right to listen to the music).[95]  Pursuant to those Terms, that right is non-transferable, non-assignable, and cannot be resold.[96]  Further, while the Terms state that participating inmates had the right to export, burn, or copy their purchased songs, that right was limited to that specific inmate's personal use, and not for any redistribution.[97] [98] Moreover, it is undisputed that prisoners purchased these songs to listen to them

---

[93] *Id.*

[94] ECF 40-1 at ¶ 36.

[95] *See* ECF 56-1 at p. 3.

[96] *Id.*

[97] *Id.*

[98] It is worth noting that the Terms do contain certain provisions regarding the removal, or blocking of access, to certain songs.  Keefe, for instance, in its sole discretion, was permitted to remove any Permanent Download from an inmate's media player, so long as the inmate was refunded for any songs taken.  Keefe was further permitted to impose further restrictions on any Permanent Download, if required by the conditions of an inmate's confinement.  Nowhere, however, do the Terms provide for the ability of the FDOC or Keefe to entirely abandon the program or require inmates to surrender *all* of their previously purchased music.

and enjoy them *while in prison*—not at some unspecified time in the future, as without the purchase of the Retention Service that allowed songs to be listened to outside of prison after the security timer expired, the songs could not be listened to outside of prison, and therefore could not be used.[99]   Therefore, by purchasing songs through the Digital Music Player Program, Plaintiff was buying the digital music file and the right to listen to the music while in prison.[100]

As such, despite previous assurances that prisoners would "always own" the songs they had purchased under the Digital Music Player Program, FDOC did not permit prisoners to transfer *any* of the music that they had purchased under the previous program to the new multimedia tablets.[101]   Instead, if prisoners want to listen to the music they had under the previous program, they are required to re-purchase it under the current Multimedia Tablet Program.[102]

### *Defendant Had Several Options for the Disposition of Prisoners' Music Other Than the Digital Music Confiscation Policy*

Rather than implement a completely unnecessary confiscation policy, FDOC in fact had several options at its disposal for the disposition of prisoners' previously purchased music, other than outright confiscation, even after withdrawing its 2014 award to Keefe and contracting with JPay.

---

[99] *See* Ex. 5 at p. 43.
[100] ECF 40-1 at ¶ 20.
[101] *See* Ex. 18.
[102] ECF 40-1 at ¶ 31.

First, FDOC had the ability to negotiate with JPay for the transfer of prisoners' music from their media players to their multimedia tablets.[103]  As noted earlier, according to the testimony of FDOC's Chief of Procurement, at no point prior to the signing of the JPay Contract did anyone from FDOC contact Keefe to determine if it was possible for Keefe to transfer the inmates' purchased music to JPay for continued use.[104]  And, while JPay informed FDOC prior to executing the JPay Contract that Keefe's position was that the music could not be transferred due to licensing restrictions, had FDOC even attempted to communicate with Keefe prior to implementing its own Digital Music Confiscation Policy, it would have discovered that Keefe was willing to indirectly transfer the inmates' purchased music to JPay, provided certain conditions were met.[105]

On or around August 2019, as a result of various litigation that had been filed against FDOC regarding this issue – including this case – FDOC again engaged in conversations with JPay and Keefe "about how to provide inmates with the music they had purchased under [FDOC's prior Digital Music Player Program]."[106]  During these conversations, Keefe clarified that while it believed it was not permitted to transfer the prisoners' music directly to JPay because of licensing restrictions, such restrictions would not prevent Keefe from having each

---

[103] *See* ECF 126-2 at 26:5-26:16.
[104] *Id*. at 36:5-36:10.
[105] *Id*. at 60:22-60:25; 61:1-61:13.
[106] *Id*. at 59:6-59:24.

participant's digital media files transferred to a CD and then mailed to that prisoner, who could then send that CD to JPay to be transferred to that prisoner's multimedia tablet.[107]  Keefe further indicated to FDOC that not only was it technically feasible for Keefe to do so, but that it was willing to do so, for the same cost of $25 per CD that had been previously negotiated.[108]

In terms of the feasibility of such a transfer of music from JPay's perspective, JPay had previously indicated to FDOC that (a) if Keefe were able to transfer the music that prisoners had purchased under the Digital Music Player Program, JPay was willing to put that music on each prisoner's tablet for them to listen to;[109] and that (b) JPay was even willing to "pay the $25.00 fee charged by Keefe to transfer an inmate's music from Keefe's storage device to JPay's player and program."[110]  JPay went even further to estimate that its willingness to pay the $25 fee and transfer the music, "not including the manual labor provided by JPay to perform this substantial task, constituted an additional half-million dollar incentive program [offered by JPay]."[111]

Second, FDOC had the ability to negotiate with JPay for the provision of sufficient media credits to compensate participating prisoners for the music that

---

[107] *Id*. at 60:22-60:25; 61:1-61:25; 62:1-62:5.
[108] *Id*. at 64:12-64:23.
[109] *Id*. at 50:13-50:17.
[110] *See* Ex 14 at p. 13.
[111] *Id*.

was confiscated.[112]   Again according to FDOC's Chief of Procurement, who led

the negotiations with JPay, the provision of credits to these inmates was simply

one of many negotiated terms; she admitted that FDOC simply made a

determination during negotiations that other value-added services were a higher

priority.[113]   Moreover, it is undisputed that even after the execution of the JPay

Contract and the initial provision of $10 in media credits, the FDOC had the ability

to continue negotiating with JPay for additional credits.[114]

In late 2017, for example, several news articles were written that involved

negative press related to FDOC's Digital Music Confiscation Policy.[115]   As a result

of that bad press, JPay reached back out to FDOC to offer additional credits to

prisoners who had previously purchased music under the Digital Music Player

Program.[116]   As a result, FDOC and JPay formalized an amendment to the JPay

Contract under which prisoners who had previously purchased music under the

Digital Music Player Program would be given an additional $40 in credit, and then

$25 in credits for each subsequent year of the contract.[117]

Finally, FDOC could have simply allowed those inmates who participated in

the Digital Music Player Program to keep their Digital Music players in an

---

[112] *See* ECF 126-2 at 26:20-26:25; 27:1-27:8.
[113] *Id*. at 27:16-27:25.
[114] *Id*. at 39:3-39:25; 40:1-40:24.
[115] *Id*.
[116] *Id*.
[117] *Id*.

unlocked state, and thus retain the ability to listen to all of their previously purchased music.[118]    FDOC's Chief of Procurement noted that FDOC had considered having Keefe remove the security timer from the media players and then return them to the prisoners, but apparently this idea was rejected by individuals in the FDOC's Office of Institutions due to "security risks."[119] However, FDOC admitted that it was unaware of – and thus did not rely on – any incidents demonstrating a security risk attendant to simultaneously possessing both a digital media player and a tablet,[120] and further admitted that there is no security risk with permitting prisoners, while in prison, to listen to the songs purchased under the Digital Music Player Program.[121]

In the end, FDOC has acknowledged the true reason for the Digital Music Confiscation Policy: additional revenue for JPay.  In response to the hundreds of grievances and administrative appeals filed by prisoners regarding the arbitrary confiscation of their property without compensation, FDOC has developed standard response language.  In these responses, FDOC explicitly admits that the confiscation of lawfully purchased property without compensation was done to allow FDOC and its new vendor to realize additional profits, stating in several grievance responses that the confiscation of all prisoners' digital media files is

---

[118] *Id*. at 44:17-44:22.
[119] *Id*. at 44:17-44:25; 45:1-45:9.
[120] *See* Ex. 19 (FDOC's 2nd Am. Resp. to Pl. First Interrogatories) at p. 15 (Interrogatory No. 11)
[121] *See* Ex. 10 at p. 10 (RFA No. 44).

"necessary" because "the download of content purchased from one vendor to another vendor's device would negate the new vendor's ability to be compensated for their services."

## MEMORANDUM OF LAW

### *Defendant's Digital Music Confiscation Policy Violates Plaintiffs' Rights Under the Takings Clause of the Fifth Amendment*

The Takings Clause of the Fifth Amendment provides that private property shall not "be taken for public use, without just compensation." It protects incarcerated people no less than anyone else, as prisoners retain constitutional rights that are "not fundamentally inconsistent with imprisonment itself or incompatible with the objectives of incarceration." *Hudson v. Palmer*, 468 U.S. 517, 523 (1984). Indeed, Justice O'Connor, concurring in *Hudson*, noted that "[t]he Due Process and Takings Clauses of the Fifth and Fourteenth Amendments stand directly in opposition to state action intended to deprive people of their legally protected property interests. These constitutional protections against the deprivation of private property do not abate at the time of imprisonment." *Id*. at 539 (O'Connor, J., concurring).

The first step in a Takings inquiry is to determine whether the government has interfered with a protected property interest. *See Penn Cent. Transp. Co. v. City of New York,* 438 U.S. 104, 125 (1978); *Givens v. Alabama Dept of Corr.*, 381 F.3d 1064, 1066 (11th Cir. 2004) ("[A] plaintiff must first demonstrate that he

-25-

possesses a 'property interest' that is constitutionally protected."). Here, it is clear that Plaintiffs have a protected property interest in their digital music—not just in the electronic song files themselves but more importantly in their ability to listen to those songs while in prison—as they were explicitly permitted to purchase, possess, and listen to the digital songs only while in prison. *See* Answer (ECF 42) ¶ 78 (admitting that "at the time of purchase the digital media files were authorized property for Plaintiff and the putative class to possess."). *See also, e.g.*, *Parratt v. Taylor*, 451 U.S. 527, 536 (1981) (noting that a prisoner's hobby kit qualified as legally protected property); *Givens*, 381 F.3d at 1069 (prisoners have limited property interest in funds in their accounts).

As explained more fully in the Statement of Facts, Plaintiffs' purchase of song credits only entitled them to access and listen to the songs while incarcerated; the songs could not be used outside of the prison after the security timer expired without the optional purchase of the Retention Service. Therefore, Plaintiffs and the class members specifically purchased the music to listen to it while in prison. This is a recognizable property interest, as the Takings Clause protects intangible property rights no less than interests in real property. *See Ruckelshaus v. Monsanto Co.,* 467 U.S. 986, 1003 (1984) (Takings Clause applies to trade secrets); *Louisville Joint Stock Land Bank v. Radford*, 295 U.S. 555, 596–602

(1935) (Takings Clause applies to real estate lien); *Horne v. Dep't of Agric.*, 135 S. Ct. 2419, 2428 (2015) (raisins).

    i.       *Defendant's Digital Music Confiscation Policy Qualifies as a*
                *Categorical Taking*

Having determined that Plaintiffs have been deprived of protected property interests in their digital music, the next step is to determine whether there has been a "taking" that requires the payment of just compensation.

The Supreme Court has identified two types of government actions that qualify as "categorical" takings, automatically triggering the compensation requirement without regard to any additional factors. The first is a physical invasion of property or physical appropriation. *See Lucas v. S.C. Coastal Council*, 505 U.S. 1003, 1015 (1992). For this category, compensation is required "no matter how minute the intrusion, and no matter how weighty the public purpose behind it." *Id*. This rule typically applies to personal property as well as real property. *See Horne*, 135 S. Ct. at 2426 (regulation requiring title to raisins be passed to the government is a physical invasion and therefore a categorical taking). The second category is where a "regulation denies all economically beneficial or productive use" of the property interest. *Lucas*, 505 U.S. at 1015. In this type of action, the government may resist paying compensation only if it shows that "the proscribed use interests were not part of [the owner's] title to begin with." *Id*. at

1027.  *See also id.* at 1030 (court should look to "existing rules or understandings" with respect to property to determine whether a taking has occurred).

The FDOC's actions under the Digital Music Confiscation Policy qualify as a categorical taking for several reasons.  First, it is a physical invasion.  Prisoners were required to surrender all access to their purchased music, as a result of having their media players confiscated.  Just like the government's demand that raisin growers turn over title to a percentage of their crop without payment, the FDOC's demand that prisoners surrender all of their purchased music is "'of such a unique character that it is a taking without regard to other factors that a court might ordinarily examine.'" *Horne*, 135 S. Ct. at 2428 (2015) (quoting *Loretto v. Teleprompter Manhattan CATV Corp.*, 458 U.S. 419, 432 (1982)).  Even though Plaintiffs' claims involve the elimination of Plaintiffs' access to their purchased music, and not the physical confiscation of the media players themselves, it was this physical confiscation that directly caused the restriction of access, and the FDOC's actions thus amount to a physical appropriation.

The FDOC's actions also amount to a categorical taking because they have denied all economically beneficial or productive use of prisoners' property interests.  *Lucas*, 505 U.S. at 1015.  The class members have no ability whatsoever to listen to the music—the only interest that matters in this context.  *See* ECF No. 56-1 at ¶ 8 (granting right to "use" music); *Rodriguez v. JPay, Inc.*, No. 19-14137,

2019 U.S. Dist. LEXIS 189391, at *13 n.7 (S.D. Fla. Oct. 30, 2019) (citations omitted) (same).[122]

As noted by the *Rodriguez* R&R, which recommended that the FDOC's Motion to Dismiss be denied based largely on the reasoning outlined in this Court's Order Denying the FDOC's Motion for Summary Judgment, ECF No. 64 ("Order Denying MSJ"), "Plaintiffs are not suing for a loss of physical property. They are suing for lost access to digital files - access that is nontransferable, non-assignable and which cannot be resold." 2019 U.S. Dist. LEXIS 189391, at *12-*13. Therefore, for Plaintiffs, who are incarcerated, these songs are not fungible, and have been rendered completely valueless as a result of the Digital Music Confiscation Policy.

Moreover, the "opportunity" provided by the FDOC for prisoners to "send home" their music was entirely illusory and is irrelevant to this Court's takings analysis. First, as discussed in the Statement of Facts and above, Plaintiffs purchased a non-transferrable, non-assignable right to access their purchased music that could not be resold. *See* Order Denying MSJ at p. 7 ("Downloaded music of the kind at issue, in contrast, cannot be sold; the right to use the music is all there is, and the right is not transferable."); *Rodriguez* R&R (same). As such, any

___

[122] Plaintiffs cite to this Report and Recommendation ("*Rodriguez* R&R") as persuasive authority, and note that the district court did not have an opportunity to adopt the R&R, as the case was administratively closed and stayed the day after the issuance of the R&R for other reasons.

outside persons who received the purchased music would not be permitted to use, access, listen to, or sell the songs.

Additionally, it is undisputed that FDOC prisoners purchased these songs to listen to them and enjoy them *while in prison*—not at some unspecified time in the future—as without the separate purchase of the Retention Service that allowed songs to be listened to outside of prison upon a prisoner's release, the music physically could not be used, listened to, or accessed by anyone outside of the facility. As such, the "send home" options – which could simply be expressed as allowing prisoners to pay for the already offered Retention Service prior to being released - does not compensate these prisoners for the taking of their ability to access and listen to their music while in prison, which was the only right purchased by Plaintiffs. *See Johnson v. King*, 85 So. 3d 307, 311 (Miss. Ct. App. 2012) (holding that confiscation of previously authorized drinking mugs was a taking, stating "an offer to ship the confiscated, drinking mug home rings hollow since [the plaintiff] would still be deprived permanently of the use of his personal property.").

> ii.    *Defendant's Digital Music Confiscation Policy Qualifies as a Regulatory Taking*

Even if Defendant's actions do not qualify as a categorical taking, they would they still amount to a regulatory taking under the Supreme Court's *Penn Central* framework. For regulatory takings—that is, restrictions on the use of

property that reduce the property's value—the Supreme Court has not developed a rigid formula for determining when a regulation goes "too far for purposes of the Fifth Amendment." *Lucas*, 505 U.S. at 1015 (quotation omitted). Instead, the Court has identified several factors relevant to this *ad hoc* determination, including 1) the extent to which the regulation has interfered with distinct investment-backed expectations, and 2) the character of the governmental action (i.e., physical invasions are more likely to qualify as takings while programs adjusting the benefits and burdens of society are less so). *Penn Central*, 438 U.S. at 124.

With regard to the first factor, the FDOC's action completely interfered with prisoners' distinct investment-backed expectations. Class members purchased the players and songs with the expectation that they would own the songs "forever." They certainly expected that they would at least be able to listen to the music for the entire period of their incarceration.

With regard to the second factor, as detailed above, the FDOC's action is more akin to a physical appropriation. As such, the FDOC's actions clearly amount to a regulatory taking.

Moreover, to the extent that the FDOC attempts to revisit the cases upholding a prison's decision to require inmates to relinquish property, this Court has found them distinguishable, because here, among other reasons, the FDOC "participated in sale of the property to inmates, represented to inmates that they

would be allowed to use the property in the facility permanently, and took a cut of the sales price."  *See* Order Denying MSJ at p. 6 (citations omitted); *Rodriguez* R&R at *10 (S.D. Fla. Oct. 30, 2019) ("In this respect, *Demler* and this case differ from the other cases FDOC cites in its memorandum.").[123]

* * *

The facts of this case demonstrate a clear unconstitutional taking.  The FDOC sold the incarcerated people of Florida digital songs that were only allowed to be used while in prison, represented to them that they would be able to keep the songs forever, profited substantially from those sales, and then confiscated those songs without compensation.  The Takings Clause prohibits these actions.

### *Defendant's Digital Music Confiscation Policy Violates Plaintiffs' Rights Under the Substantive Due Process Clause of the Fourteenth Amendment*

Plaintiffs prevail on their substantive due process claim if the challenged "regulation is arbitrary and capricious, does not bear a substantial relation to the public health, safety, morals, or general welfare, and is therefore an invalid

---

[123] Both this Court, and the *Rodriguez* R&R, noted that the only case that was "somewhat similar" was *Sorrentino v. Godinez*, 2013 U.S. Dist. LEXIS 142962, 2013 WL 5497244 at *4-7 (N.D. Ill. Oct. 3, 2013).  However, the *Rodriguez* R&R at *6-8, adopted this Court's reasoning that *Sorrentino* "is not on point" and further found that, unlike the factual scenario in *Sorrentino*, "[u]nder FDOC's new policy, not only can Plaintiffs not listen to their digital music, they cannot receive any economic benefit from it.  They are therefore deprived of its entire value." *Rodriguez* R&R at *13 (citing *Penn Cent. Transp. Co.*, 438 U.S. at 105); *Bickerstaff Clay Prods. Co. v. Harris County*, 89 F.3d 1481, 1489 (11th Cir. 1996) ("The [Takings] clause applies in any case in which government action renders private property worthless.")).  Moreover, as noted by this Court, unlike the typewriter in *Sorrentino* that could be easily sold, here, "[d]ownloaded music of the kind at issue, in contrast, cannot be sold; the right to use the music is all there is, and the right is not transferable."  Order Denying MSJ at p. 7.

exercise of the police power." *Eide v. Sarasota County*, 908 F.2d 716, 721 (11th Cir. 1990). *See also Exec. 100, Inc. v. Martin Cty*., 922 F.2d 1536, 1540 (11th Cir. 1991) ("Third, a plaintiff may argue that the regulation, either on its face or as applied, is arbitrary and capricious, does not bear a substantial relation to the public health, safety, morals, or general welfare, and therefore is an invalid exercise of the police power.").[124]

Here, the undisputed facts make clear that the FDOC's Digital Music Confiscation Policy was arbitrary and capricious, and did not bear a substantial relationship to the public health, safety, morals, or general welfare. As demonstrated above, the FDOC knew that transitioning to the Multimedia Tablet Program could result in the confiscation of millions of dollars of digital music from the prisoners in its custody. But it made nearly no effort to avert this outcome. Indeed, FDOC had several options at its disposal for the disposition of inmates' previously purchased music, other than outright confiscation.

First, it could have actually pursued the option of having Keefe transfer the music to JPay. Although FDOC inquired about this, it abandoned it entirely after being told by JPay (the entity standing to lose millions of dollars from this

---

[124] Note that, because the FDOC's action was legislative, rather than executive, traditional property rights trigger substantive due process protections, and Plaintiffs need not demonstrate that the action shocks the conscience. *McKinney v. Pate*, 20 F.3d 1550, 1557 n. 9 (11th Cir. 1994). *See also* R&R at *17 (noting that the FDOC failed to provide any "legal authority for the proposition that its legislative acts are not actionable unless they rise to a conscience shocking level."). The action was legislative because it was a broad-based regulation affecting all incarcerated people rather than a ministerial or administrative act.

arrangement) that Keefe was unwilling to do it.  Had FDOC actually pursued it, it would have learned that Keefe was in fact willing to do it under certain conditions.

Second, the FDOC could have negotiated with JPay for the provision of sufficient media credits to compensate the participating inmates for the music that was confiscated. But the FDOC sacrificed this effort as well to obtain other "priorities" such as iPads for their officers.  Third, it could have allowed inmates to keep their media players if they were unwilling to transition to the Multimedia Tablet Program.

The FDOC chose none of these options.  Rather, it decided to simply require prisoners to bear the financial burden of the transition and confiscated their lawfully purchased property.   This action was arbitrary, capricious, was not substantially related to any government action, and therefore violated the Substantive Due Process Clause.

## CONCLUSION

For all the foregoing reasons, Plaintiffs respectfully request that summary judgment be granted in their favor, and that the parties be given an opportunity to provide briefing as to the proper remedy.

**Certificate of Word Limit.**  Pursuant to N.D. Fla. Local Rule 7.1(F), this motion contains 7,953 words.

Respectfully submitted,

Dante P. Trevisani, Esq.
Florida Bar No. 72912
dtrevisani@floridajusticeinstitute.org
Ray Taseff, Esq.
Florida Bar No. 352500
rtaseff@floridajusticeinstitute.org

Florida Justice Institute, Inc.
100 S.E. 2nd Street
3750 Miami Tower
Miami, Florida 33131-2309
305-358-2081
305-358-0910 (FAX)

By:    *s/Dante P. Trevisani*
         Dante P. Trevisani, Esq.

Shawn A. Heller, Esq.
Florida Bar No. 46346
shawn@sjlawcollective.com
Joshua A. Glickman, Esq.
Florida Bar No. 43994
josh@sjlawcollective.com

Social Justice Law Collective, PL
974 Howard Ave.
Dunedin FL 34698
Tel: (202) 709-5744

By:    *s/Joshua A. Glickman*
         Joshua A. Glickman, Esq.

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that I electronically filed today, March 5, 2020, the foregoing with the Clerk of the Court using the CM/ECF system, which will send notification of such filing to all persons registered to receive electronic notifications for this case, including all opposing counsel.

By: *s/Joshua A. Glickman*
Joshua A. Glickman, Esq.