## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF FLORIDA
### Tallahassee Division

WILLIAM DEMLER, individually,
and on behalf of all others similarly situated,

     Plaintiff,

vs.                                        Case No. 4:19-cv-00094-RH/GRJ

MARK S. INCH, in his official capacity as
Secretary of the Florida Department of
Corrections,

     Defendant.

_____/

**PLAINTIFFS' RESPONSE TO DEFENDANT MARK S. INCH'S MOTION
FOR SUMMARY JUDGMENT AND MEMORANDUM OF LAW
IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT**

Plaintiffs, William Demler, Wayne Pula, and Michael Gisi, by and through

undersigned counsel, hereby responds to Defendant's Motion for Summary

Judgment, ECF Nos. 137-38 ("Motion").[1]

### A.    Defendant's Statement of Facts is Replete with Disputed Facts that Preclude Summary Judgment in its Favor

At the outset of Defendant's Motion, in an attempt to distance itself from

this Court's holdings in denying Defendant's previously filed summary judgment

motion,[2] Defendant summarizes the five ultimate conclusions that, in its

_____

[1] All defined terms in Plaintiffs' Corrected Motion for Summary Judgment, ECF No. 140, shall
be ascribed the same meanings herein.
[2] *See* ECF 64.

estimation, now warrant the granting of summary judgment in its favor, as well as the "undisputed" evidence that purportedly supports each of those conclusions.[3] Even a cursory glance at this list, however, demonstrates that it relies almost entirely on disputed facts that preclude summary judgment in its favor.

  i.   _The Plaintiff Class was Explicitly Promised That They Would "Always Own" Purchased Music_

First, Defendant states "inmates were never promised that they would 'own' purchased music nor 'own' it forever."[4] In support of this conclusion, Defendant relies on one document: an affidavit from John Bryant, executed for the sole purpose of supporting Defendant's Motion.[5]  However, nowhere in Mr. Bryant's affidavit does he state that inmates were never promised that they would "own" purchased music nor "own" it forever.  Instead, Mr. Bryant's affidavit deals solely with the contention that <u>FDOC</u> is not responsible for the representations made to the Plaintiff Class, not that such representations were never made.  As such, despite the fact that Defendant declares that this is one of only two issues on which this "case rests entirely,"[6] Defendant has not provided not a single piece of record evidence in support of it.

---

[3] ECF 138 at pp. 6-7.
[4] _Id_. at p. 6.
[5] _See_ ECF 134-1.
[6] _Id_. at p. 2.

By contrast, Plaintiff's Motion for Summary Judgment contains numerous, undisputed material facts on which this Court can conclusively establish that the Plaintiff Class was in fact <u>explicitly</u> promised that they would "own" purchased music and "own" it forever.[7]   For instance, it is undisputed that numerous posters and advertisements regarding the Digital Music Player Program were posted and provided to the Plaintiff Class.[8]   Further, it is undisputed that a widely distributed advertisement included this explicit representation:

> Browse, search and preselect songs from updated music catalogs holding millions of song titles representing a wide array of music genres.  You have the ability to purchase and listen to unlimited music utilizing the re-download feature of free of charge.  **Once music is purchased, you'll always own it!**  (emphasis added).[9]

The user guide that accompanied the music players similarly emphasized the permanent ownership of songs purchased:

> You can delete and re-order songs as often as you want.  You will never be charged for a song that is ordered from the Re-Order Manager.  **After all, you have already paid for the song once; we don't think you should ever have to pay for it again.** (emphasis added).[10]

Contrary to the assertions made in Defendant's Motion, nothing in Mr. Bryant's affidavit operates to rebut this clear record evidence.

---

[7] *See* ECF 140 at pp. 5-6.
[8] *See* ECF 140-4; 140-8.
[9] ECF 140-8 (MP4 Advertisement).
[10] ECF 140-5 at p. 15.

ii.     *Defendant Itself Promoted Permanent Ownership of Purchased Music*

Defendant's second ultimate conclusion is that "if any such promises were made, DOC never made them nor can they be imputed to DOC."[11]   As noted above, because Defendant completely failed to contradict the undisputed record evidence that such promises were in fact made, the only question is whether DOC made them, or, if not, whether they can be imputed to DOC nonetheless.[12]

In support, Defendant once again relies on Mr. Bryant's affidavit, which includes several conclusory statements that purport to support Defendant's position.[13]   For instance, Defendant's Motion states "at no time did DOC author, prepare, draft, compose, or create any of the advertisements, order forms, user guide, or any other written material," and that "DOC's **only** involvement … prior to posting or dissemination was to review them exclusively for security related issues." (emphasis in original).[14]

These disputed statements are clearly at odds with the record evidence.  At Defendant's 30(b)(6) deposition, Defendant admitted that every single advertisement that was posted or distributed in FDOC facilities was "reviewed,"

---

[11] ECF 138 at p. 6.

[12] As discussed more fully below, Defendant's actions constitute an unconstitutional categorical taking, regardless of what representations were made to the Plaintiff Class, or who made them. *See supra* pp. 17-18.  Nonetheless, to the extent the Court finds this information relevant to a regulatory takings analysis, and because the record evidence clearly establishes that such representations were in fact made, Plaintiff will address those representations again here.

[13] *See* ECF 138 at pp. 12-13.

[14] *Id*. at p. 12.

"cleared," and "approved" by FDOC.[15]   Moreover, internal communications between Defendant and Keefe during the pendency of the Digital Music Player Program demonstrate that FDOC, and Mr. Bryant specifically, did not review these materials "exclusively" for security related issues, but also reviewed them for purposes of content and accuracy.[16]   This is also consistent with how FDOC currently reviews analogous advertisements and posters for the current Multimedia Tablet Program, which FDOC similarly reviews and edits for content, accuracy, and even persuasiveness.[17]

By contrast, Plaintiff's Motion for Summary Judgment contains undisputed material facts on which this Court can conclusively establish that Defendant itself promoted permanent ownership of purchased music.[18]   For instance, it is undisputed that the exact same advertisement that promised the Plaintiff Class that they would permanently own purchased music ("once music is purchased, you'll always own it!") also displayed the following statement, in lettering bigger than any other text on the page and in a contrasting color for emphasis:

---

[15] *See* ECF 140-7 at 7:16-7:25; 8:1-8:9.
[16] *See* Ex. 1 (Email Communication between FDOC and Keefe regarding FDOC's revision and approval of MP3 Order Form and Advertisement).
[17] *See* Ex. 2 (Email Communication between FDOC and JPay regarding FDOC's substantive revisions, suggestions, and edits to marketing materials for the Multimedia Tablet Program).
[18] *See* ECF 140 at pp. 5-6.

# Florida Department of Corrections
# NOW ACCEPTING ORDERS[19]

The evidence is undisputed that Defendant was aware of, reviewed, cleared, and approved this advertisement for distribution to the Plaintiff Class.[20]   If Defendant disagreed with either the representation regarding permanent ownership of purchased music or the prominent inclusion of FDOC's name, it would have either revised the advertisement or it would not have approved its distribution.[21] Although Plaintiff's position remains that the precise entity that made the representation is irrelevant, this is nonetheless more than sufficient for the Court to find that these representations can be attributed to Defendant.

      iii.    *The Plaintiff Class's Right and Ability to Listen to Their Music While in Prison was Completely Extinguished by Defendant's Digital Music Confiscation Policy*

The third ultimate conclusion on which Defendant relies is that "inmates never owned the digital music they purchased.  To this day, inmates do 'own' their MP3 Players[22] and continue to 'own' whatever ownership interest they acquired in the digital music licenses."[23]

---

[19] ECF 140-8 (MP4 Advertisement).
[20] *See* ECF 140-7 at 7:16-7:25; 8:1-8:9.
[21] *Id*.
[22] In its Statement of Facts and in Section IV(C) of its Memorandum of Law, Defendant again inexplicably inserts arguments regarding FDOC's confiscation of the Plaintiff Class's physical media players, and asks for summary judgment to be granted in its favor on that issue, despite

In so arguing, Defendant displays a fundamental misunderstanding of the right that was purchased by the Plaintiff Class (i.e., the right to personally use the music while in prison), as well as how Defendant interfered with Plaintiff's property interest in that "right of use" so as to violate the Plaintiff Class's constitutional rights.  Conversely, this Court has appropriately framed the scope of the right at issue.  *See* Order Denying FDOC's Motion for Summary Judgment, ECF No. 64 at p. 7 ("Downloaded music of the kind at issue, in contrast, cannot be sold; the right to use the music is all there is, and the right is not transferable.") (emphasis added).

In support of its contention, Defendant relies on a single document: the Digital Music Player Program's "Terms of Sale for Permanent Music Downloads" ("Terms of Sale").[24]  Specifically, Defendant relies on the following statement from the Terms of Sale to support its conclusion that the Plaintiff Class "never owned the digital music they purchased":

> Permanent Downloads may be owned by ACCESS or its licensors ("Content Owners"), and in all circumstances, You understand and acknowledge that all Permanent Downloads embody the intellectual property of a third party and Your rights with respect to Permanent Downloads will be limited by copyright law.[25]

---

the fact that Plaintiffs have never included the physical players as part of their claims.  *See* ECF No. 138, pp. 6; 21-22.

[23] *See* ECF 138 at p. 6.

[24] *See* ECF 56-1.

[25] *Id*. at p.2, ¶ 5.

However, the Plaintiff Class has never alleged that they "owned" the underlying intellectual property rights of any of the musical compositions that they downloaded, nor are any issues of copyright, patent, or trademark law implicated by this case.[26]   The Terms of Sale do, however, explicitly describe the right that was purchased by the Plaintiff Class:

> Upon payment of the Permanent Download Fee, ACCESS grants You a non-exclusive, non-transferable right to use the Permanent Download.[27]

Moreover, it is undisputed that this purchased right to personally use the Permanent Download was a right to listen to the music *while in prison*, as none of the purchased music could be listened to outside of any FDOC facility – by anyone – without a separate and additional purchase of Keefe's optional Retention Service.[28]   As such, the right at issue – and the right that has been entirely extinguished by Defendant – is the Plaintiff Class's right to personally use the music while in prison.   *See, e.g., Rodriguez.* 2019 U.S. Dist. LEXIS 189391, at *12-13 ("Plaintiffs are not suing for a loss of physical property.  They are suing for lost access to digital files – access that is nontransferable, non-assignable, and which cannot be resold.").

---

[26] *See Rodriguez v. JPay, Inc.*, 2019 U.S. Dist. LEXIS 189391, at *13 ("As to FDOC's copyright arguments, the fact that Plaintiffs are not the content owners of the media involved is not in dispute.  Plaintiffs do not claim to own the copyrighted works themselves, but say they owned a right to use and/or access the works once purchased, and that right has been taken without just compensation.").

[27] ECF 56-1 at ¶ 8.

[28] *See* ECF 140-5 at p. 43.

As such, Defendant's conclusion that the Plaintiff Class "continue[s] to 'own' whatever ownership interest they acquired in the digital music licenses"[29] is not only entirely contradicted by the record, but is also irrelevant. Notwithstanding Defendant's attempt to obscure this basic premise with misleading claims about ownership, it is undisputed that the Plaintiff Class's purchased right to personally use their music while in prison was completely extinguished by Defendant's Digital Music Confiscation Policy. *See* ECF 126-2 (Deposition of Kasey Bickley) at 47:14-47:23 (admitting that the Plaintiff Class can no longer listen to their purchased music "while they're in prison."); ECF 140-10 (FDOC's Amended Response to Plaintiff's First Request for Admissions, #28, wherein FDOC admits that prisoners are no longer able to listen, while in prison, to the music they had purchased).

iv.     <u>*The Plaintiff Class Does Not Allege that their Purchased Music is "Lost"*</u>

The fourth and fifth ultimate conclusions on which Defendant relies involves a curious and repeated reference to whether the Plaintiff Class's purchased music has been "lost."[30]

First, as explained more fully above, the Plaintiff Class is not suing for a loss of physical property, and is not alleging that any of their purchased music has been

---

[29] *See* ECF 138 at p. 6.
[30] *Id*. at p. 7.

"lost."  Instead, the Plaintiff Class alleges that they purchased and owned the right to listen to their music while in prison, and that this right has been completely extinguished.  The current physical location of the digital music files themselves is completely irrelevant; the Plaintiff Class indisputably has no ability to listen to them while in prison, regardless of where they are located.[31]

While not relevant to the claims of the Plaintiff Class for the reason just stated, it appears that Defendant's confusion stems from certain allegations made in Plaintiff Demler's original Complaint in this case, filed February 19, 2019.[32] Contrary to Defendant's dramatic attempts to paint Mr. Demler's allegations – made "under information and belief"[33] – as an attempt to "delude the Court into believing that some of the digital music stored on the ACCESS server may have been 'lost forever,'"[34] the undisputed facts demonstrate that Mr. Demler's allegation was accurate at the time that it was made based on his personal knowledge, and may still in fact be true to this day.

It is undisputed that when Defendant first made the unilateral decision to implement its Digital Music Confiscation Policy, it sent out a series of notices informing the Plaintiff Class that Defendant would be confiscating all of their previously purchased music, and listing the various dates on which certain events

---

[31] *See* ECF 126-2 (Deposition of Kasey Bickley) at 47:14-47:23; ECF 140-10 at #28.
[32] *See* ECF 138 at p. 20; ECF 1 at ¶ 45.
[33] *Id.*
[34] *See* ECF 138 at pp. 20-21.

would occur.[35]   Those notices informed inmates that on January 23, 2018, Defendant would be cutting off prisoners' access to the purchased songs contained in each prisoner's "Re-Order Manager," allowing prisoners to temporarily keep their media players but preventing them from downloading their own previously purchased music that was not physically on their players.[36]

Prisoners were then given the option to either (a) surrender their media player to Defendant to be destroyed; (b) mail their locked media player to someone outside of prison and allow that person to purchase Keefe's Retention Service by mailing the media player to Keefe to have the Security Timer removed; (c) mail their locked media player to someone outside of prison, which without the subsequent purchase of the Retention Service, would result in the player ceasing to operate for play or transfer; or (d) purchase the Retention Service and mail their media player directly to Keefe, which would result in the removal of the Security Timer or transferring of their music to a CD, and the subsequent mailing by Keefe of the unlocked media player or CD to someone outside of prison to hold.[37] [38]

It is undisputed that none of the notices or other materials provided to the Plaintiff Class regarding the Defendant's Digital Music Confiscation Policy

---

[35] *See* ECF 140-18 (FDOC Confiscation Notice).
[36] *Id*.
[37] *Id*; *see also* ECF 40-1 at ¶ 26.
[38] It is again worth noting that all of these options would have been available to the Plaintiff Class upon their release, regardless of the Digital Music Confiscation Policy, and none of these options permit the use that was purchased by the Plaintiff Class (the right to use (listen to) the music while in prison).

mentioned what would happen to any purchased music that was stored only in a prisoner's "Re-Order Manager." Additionally, the Plaintiff Class's access to those songs had already been completely cut off as of January 23, 2018.[39] As such, it was completely reasonable for Mr. Demler to believe that "there was no option to retrieve [those songs] and send them to someone outside of prison."[40]

Moreover, while Defendant relies on the affidavit of Carla Knysak to conclude that all of a prisoner's purchased music is available to be downloaded to a CD-ROM and shipped to someone outside prison – including any purchased music on that prisoner's "Re-Order Manager" – this is certainly a contested fact, as Defendant has produced no evidence that any prisoner has actually been able to transfer any purchased music to a CD, and the record evidence in fact suggests that this option may be illusory.[41]

> ## v.    *Other "Undisputed Facts" Asserted by Defendant that are Contradicted by Record Evidence*

Defendant's statement of "Undisputed Facts" also contains a myriad of other purportedly undisputed facts that are contradicted by the record. For instance, Defendant cites to Mr. Demler's deposition to claim that, "Plaintiff knew he could mail his player to ACCESS and have ACCESS download his music onto a CD-

---

[39] *Id.*

[40] *See* ECF 1 at ¶ 45.

[41] *See* Ex. 3 (Declaration of David Reutter) at pp. 3-5 (noting that a FDOC prisoner and his family member attempted to utilize the option to have ACCESS download all of his purchased music onto a CD, and was told by ACCESS that this could and would not occur until he was released from prison); *see also* Ex. 4 (Declaration of Sabrina Reutter) at pp. 1-2 (same).

ROM."[42]   However, this statement is directly contradicted by Mr. Demler's clarified testimony only minutes later in the same deposition.  *See* ECF 126-1 at 29:13-21 ("Q. And if you wanted to, you could have [the music on your mp3 player] transferred to a CD-ROM is that correct?  THE WITNESS:  No.").

Defendant similarly cites to Mr. Demler's deposition transcript to claim that "[w]hile Plaintiff had possession of the digital player, he could have allowed his cellmate to listen to the music on the player.  After he mailed the player to his uncle, his uncle could have listened to the music on the player, as could anyone else that his uncle allowed."[43]   However, while Defendant may have induced Mr. Demler at deposition to acknowledge his <u>belief</u> that these hypothetical actions were allowed, they would in fact be in violation of the Terms of Service, which granted Mr. Demler a non-transferable right to personally listen to his purchased music while in prison, and *not* the ability to transfer that right to his cellmate, his uncle, or anyone other than himself for his own personal use.[44][45]

Defendant next moves to the testimony of Carla Knysack, citing to her affidavit for the repeated proposition that "[all] of the digital music purchased by DOC inmates … is all available for retrieval by any inmate who wishes to have his or her music downloaded onto a CD-ROM … [and] then mailed to any designated

---

[42] ECF 138 at p. 8.
[43] ECF 138 at p. 9.
[44] *See* ECF 56-1 at pp. 2-3, ¶ 8; ECF 140-5 at p. 43; *Rodriguez* R&R at *12-13.
[45] Even Defendant acknowledges that the Plaintiff Class's right to listen to the music is non-transferable.  *See* ECF 138 at p. 14.

individual outside DOC institutions."[46]  As noted above, however, this testimony is directly contradicted by the experiences of the prisoners themselves, which suggest that the retrieval process suggested by Ms. Knysack is illusory.[47]

Finally, Defendant relies on the deposition testimony of Kasey Bickley to assert, first, that during the pendency of the Digital Music Player Program, the "transfer of inmates' music from ACCESS to the replacement digital tablets was discussed on multiple occasions with ACCESS,"[48] and, second, that "[i]t was eventually determined that the transfer of music was not technologically feasible."[49]

Both of these assertions are contradicted by the record.  First, according to Kasey Bickley's same deposition testimony, at no point prior to the onset of Defendant's contract with JPay did anyone from FDOC discuss with Keefe whether it was possible for Keefe to transfer the previously purchased music to JPay for continued use, nor did anyone from FDOC do any additional investigation into whether the previously purchased music could be transferred.[50]

Moreover, when Defendant finally did reach out to Keefe to determine whether the Plaintiff Class's lawfully purchased music could be transferred – in August 2019, well after the Plaintiff Class's music had been confiscated, and

---

[46] ECF 138 at p. 10-11.
[47] *See* ECF 126-1 at 29:13-21; Ex. 3 at pp. 3-5; Ex. 4 at pp. 1-2.
[48] *See* ECF 138 at p. 11.
[49] *Id.*
[50] *See* ECF 126-2 at 36:5-36:10; 36:22-36:25; 37:1-37:7.

solely in response to the negative publicity that followed the filing of the instant case and others similar to it – the record demonstrates that the transfer of the Plaintiff Class's music was, in fact, technologically feasible.  *See* ECF 126-2 at 60:22-60:25; 61:1-61:25; 62:1-62:25; 64:12-64:23 (testifying that Keefe offered, for a $25 fee, to have each prisoner's digital media files transferred to a CD and then mailed to that prisoner, who could send that CD to JPay to be transferred to that prisoner's multimedia tablet, and that such a process was technologically feasible); *see also* ECF 140-14 at p. 13 (JPay previously indicating that it was willing to pay the $25 fee charged by Keefe to transfer an inmate's music from a storage device to JPay's player and program, and that the "manual labor provided by JPay to perform this substantial task constituted an additional half-million dollar incentive program.").

## B.   **Defendant's Memorandum of Law Fails to Refute Well-Settled Law Establishing that Defendant Violated the Takings Clause of the Fifth Amendment**

### i.   *Defendant's Argument that it is not Responsible for the Representations Made to the Plaintiff Class is Both Irrelevant and Without Merit*

At the very start of its Motion, Defendant states that "[t]his case rests entirely on two issues."[51]  The first, it argues, is "whether promises allegedly made to inmates through written materials created by ACCESS can be imputed to

---

[51] *See* ECF 138 at p. 2.

DOC."[52]  Because, Defendant asserts, "[t]he record now establishes that no such promises were made," it should be granted summary judgment.[53]

At the outset, Plaintiff notes that Defendant's actions constitute an unconstitutional categorical taking, regardless of what representations were made to the Plaintiff Class, or who made them.  As discussed fully in Plaintiff's Motion for Summary Judgment and incorporated by reference here, Defendant's unilateral actions in creating, implementing, and enforcing its Digital Music Confiscation Policy qualify as a categorical taking as both a physical appropriation and as a denial of all economically beneficial or productive use of the Plaintiff Class's property interests (i.e., the right to listen to the music while in prison).  *See* ECF 140 at pp. 27-30, *citing Lucas v. S.C. Coastal Council*, 505 U.S. 1003, 1015 (1992); *Horne v. Dep't of Agric.*, 135 S. Ct. 2419, 2428 (2015); *Johnson v. King*, 85 So. 3d 307, 311 (Miss. Ct. App 2012).  As such, just compensation is required, without regard to any additional factors, including what representations may have been made to the Plaintiff Class, or by whom.  *See id*.

Nonetheless, to the extent this Court finds these representations relevant to a regulatory takings analysis,[54] and as discussed more fully above, the record here

---

[52] *Id*.

[53] *Id*. at p. 14.

[54] As argued in Plaintiff's Motion for Summary Judgment, these representations encouraged the Plaintiff Class to purchase the music, as they assured them that by paying the fee of $1.70 per song they would always own the right to use (i.e. listen to) the songs while incarcerated, which was their distinct investment-backed expectation, given that the songs purchased could not and

contains numerous, undisputed materials facts that conclusively establish that the Plaintiff Class was in fact promised that they would "own" purchased music and "own" it forever.  Indeed, nowhere was this more clearly stated than in the numerous posters and advertisements that not only explicitly promised the Plaintiff Class that they would permanently own purchased music ("once music is purchased, you'll always own it!"),[55] but also clearly represented that such promises were being made on behalf of Defendant ("Florida Department of Corrections NOW ACCEPTING ORDERS").[56]

Moreover, the evidence is undisputed that Defendant was not only aware of, reviewed, cleared, and approved these materials for distribution to the Plaintiff Class, but also had the ability to either revise them or forbid their distribution if Defendant disapproved of any of the clear representations made therein.[57]  As such, regardless of the original authorship, their content can be attributed to Defendant. *See Rodriguez v. JPay, Inc.*, 2019 U.S. Dist. LEXIS 189391, at *12 (S.D. Fla. Oct. 30, 2019) (citations omitted); *Martin v. Palm Beach Atl. Ass'n*, 696 So. 2d 919, 922-923 (Fla. 4th DCA 1997) ("In the instant case, the association may not have

---

may not be used outside the prison setting without the purchase of the Retention Service. ECF 140 at pp. 30-32, *citing Penn Central Transp. Co. v. City of New York*, 438 U.S. 104, 124 (1978) (listing as a factor in determining whether a regulatory taking has occurred "the extent to which the regulation has interfered with distinct investment-backed expectations.").

[55] *See* ECF 140-8.

[56] *See* ECF Nos. 140-4, 140-8.

[57] *See* ECF No. 140-7, (Rule 30(b)(6) Deposition of FDOC (Carl Wesley Kirkland, Jr.)) at 7:16-7:25, 8:1-8-19.

enforced the [discriminatory] restrictions in question, but it neither took steps to remove the offending restrictions … nor communicated their unenforceability to appellant."); *Hintz v. Chase*, 2017 U.S. Dist. LEXIS 126478, at *9 (N.D. Cal. Aug. 9, 2017) (holding that Defendant real estate agent was responsible for discriminatory statements in an email authored by a non-party homeowner but forwarded by the Defendant agent to prospective renters); *Willborn v. Sabbia*, 2011 U.S. Dist. LEXIS 53847, 2011 WL 1900455, at *4 (N.D. Ill. May 19, 2011) (denying motion to dismiss by real estate agent who merely conveyed discriminatory statements originally made by the non-party homeowner).

      ii.    *The Plaintiff Class's Ownership Interest in its Right to Listen to Purchased Music Has Been Completely Extinguished by the Digital Music Confiscation Policy*

The second of two issues on which Defendant asserts "[t]his case rests entirely" is, as outlined by Defendant, "whether constitutional relief is available to inmates when dispossessed of their ability to personally use a purchased license for digital music."[58]  Because, Defendant claims, "these licenses have no economic value," the Plaintiff Class has not been deprived of any property ownership and summary judgment is therefore warranted in favor of FDOC.[59]

As laid out in Plaintiff's Motion for Summary Judgment, it is clear that the Plaintiff Class has a protected property interest in the right to use (listen to) the

---

[58] ECF 138 at p. 3.
[59] *Id*.; *Id*. at pp. 24-34.

songs they purchased while in prison, which they owned, and which have now been taken by Defendant acting in its sole capacity.  *See* Order Denying MSJ at *7 (noting that "the right to use the music is all there is."); *Rodriguez* R&R at *10-13; *Rodriguez* R&R at *13 n.7 ("inmates purchased 'a nonexclusive, nontransferable <u>right to use</u> the permanent download[s]'") (quoting Terms at ¶8 (emphasis in *Rodriguez* R&R)); *see also* ECF 140 at p. 26, *citing Ruckelshaus v. Monsanto Co.*, 467 U.S. 986, 1003 (1984) (finding that the Takings Clause protects intangible property rights no less than interests in real property); *Horne v. Dep't of Agric.*, 135 S. Ct. 2419, 2428 (2015) (same).

In an attempt to distance itself from this clearly established right, Defendant first regurgitates its argument that inmates do not "own" the underlying intellectual property rights of any of their purchased music.[60]  As noted earlier, at no point has any member of the Plaintiff Class ever alleged that they "owned" the musical compositions themselves, or that any issues of copyright, patent, or trademark law are implicated by this case.  In fact, this disingenuous argument has already been properly rejected by the *Rodriguez* court:

> [T]he fact that Plaintiffs are not the content owners of the media involved is not in dispute.  Plaintiffs do not claim to own the copyrighted works themselves, but say they owned a right to use and/or access the works once purchased, and that right has been taken without just compensation.  FDOC cites no law to support its position

---

[60] *Id*. at pp. 25-26.

that Plaintiffs' right to use or access digital media they purchased is not property that could be subject to a taking.[61]

Just as in *Rodriguez*, Defendant here has put forth no relevant authority to support its position that the Plaintiff Class's right to use (listen to) digital media they purchased is not property that could be subject to a taking.  Instead, FDOC begins its argument by citing to cases that do not stand for the proposition that Defendant ascribes to them, but involve holdings that governmental permits and licenses that increase the value of land do not similarly increase the compensation owed to the landholder.  *See* ECF No. 138, p. 26 (citing *United States v. Fuller*, 409 U.S. 488, 493 (1973); *Alves v. United States*, 133 F.3d 1454, 1457 (Fed. Cir. 1998)).  Those holdings are irrelevant to this case, however, as this case does not involve a governmental issued license or permit or the unique legal properties that such governmentally issued rights involve, and the Plaintiff Class is not asserting that such a permit or license increased the value of their taken property.

Defendant then quotes *Loretto v. Teleprompter Manhattan CATV Corp.*, 458 U.S. 419, 435-36 (1982), in support of its assertion that no protected property right can exist here because the Plaintiff Class did not have the ability to sell or transfer their purchased right to listen to their music.[62]

---

[61] *See Rodriguez* R&R at *13-14.
[62] *See* ECF 138 at p. 26.

Plaintiff first notes that the quote reproduced by Defendant does not actually come from *Loretto*, as represented by Defendant, but from *Conti v. United States*, 291 F.3d 1334, 1341 (Fed. Cir. 2002), wherein the court does state "[t]he rights to sell, assign, or otherwise transfer are traditional hallmarks of property." Regardless, both cases include explicitly non-exclusive lists of things that can be considered as part of a bundle of rights that are commonly characterized as "property."   Unsurprisingly, Defendant has failed to point to any holdings from either of these cases that stands for the somewhat absurd proposition that an item of property can never be unconstitutionally taken unless that item could have be re-sold prior to the taking.[63] [64]

Defendant has similarly failed to point to any legal authority for its proposition that the Plaintiff Class's right to listen to their purchased music while in prison has "no economic value."[65]   It is undisputed that members of the Plaintiff

---

[63] In a similar vein, FDOC cites to *Kaiser Aetna v. United States*, 444 U.S. 164, 176 (1979), with no explanation, but apparently for the premise that "the right to exclude others," is yet another part of the bundle of rights that are commonly characterized as "property."   Again, like all of the others, these rights are non-exhaustive parts of this "bundle of rights," and in no way stand for the premise "that Plaintiffs' right to use or access digital media they purchased is not property that could be subject to a taking."   *See Rodriguez* R&R, pp. *13-14.

[64] Defendant also cites to *Conti* for the proposition that "if the property can be put to other use, there is no constitutional taking."   ECF 138 at p. 33.   This is simply wrong.   A determination that there is no economic value remaining is only a precursor to finding a categorical taking; the government can still effect a regulatory taking and leave some economic value to the property. If a government built a road through a homeowner's backyard, for example, that would unquestionably be a taking, even though the property still retained some value.
[65] ECF 138 at pp. 32-33.

Class purchased this right to listen to music while in prison for $1.70 per song.[66] This is economic value.  It is similarly undisputed that the current replacement cost for the same digital file and right to listen to it while in prison is, at a minimum, $1.00.[67]  This also represents economic value.  As a result of the taking effected by the Defendant, this value has now been completely extinguished.  *See Bickerstaff Clay Prods. Co. v. Harris County*, 89 F.3d 1481, 1489 (11th Cir. 1996) ("The [Takings] clause applies in any case in which government action renders private property worthless.").

In short, the value of the right to use (listen to) the songs while in prison is not the amount it can be sold for, but rather, the cost of replacing it, which is currently $1.00 per song.[68]  If the injunction is granted and the songs and the right and ability to listen to the songs are restored, so will the economic value of the Plaintiff Class's right to listen to those songs while incarcerated.  That is the reason why an injunction is needed.    As such, to the extent that the Court finds, as Defendant has argued, that economic value is a factor to consider when determining whether the owned right to listen to the songs while in prison constitutes property, that factor has been met here.

---

[66] *See* ECF 40-3 (Media Order Form).
[67] *See* ECF 71-2 at p. 37 (JPay Contract).
[68] *Id*.

Finally, Defendant then cites, again, to the same already-distinguished string of cases that it has cited multiple times for the proposition that FDOC can order that property be sent outside of the prison as "a possession restriction that [does] not affect ownership."[69]   Both this Court and the *Rodriguez* Court have already distinguished these cases multiple times.   *See, e.g.,* ECF 64 at p. 6 ("Here the Department participated in the sale of the property to inmates, represented to inmates that they would be allowed to use the property in the facility permanently, and took a cut of the sales price … None of the Department's cited cases involve similar facts."); *Rodriguez* R&R at *10 (S.D. Fla. Oct. 30, 2019) ("In this respect, *Demler* and this case differ from the other cases FDOC cites in its memorandum.")[70] [71]

---

[69] *See* ECF 138 at pp. 28-29.

[70] As discussed in Plaintiff's Motion for Summary Judgment, both this Court, and the *Rodriguez* R&R, noted that the only case that was "somewhat similar" was *Sorrentino v. Godinez*, 2013 U.S. Dist. LEXIS 142962, 2013 WL 5497244 at *4-7 (N.D. Ill. Oct. 3, 2013).   However, the *Rodriguez* R&R at *6-8, adopted this Court's reasoning that *Sorrentino* "is not on point" and further found that, unlike the factual scenario in *Sorrentino*, "[u]nder FDOC's new policy, not only can Plaintiffs not listen to their digital music, they cannot receive any economic benefit from it.   They are therefore deprived of its entire value."   *Rodriguez* R&R at *13 (citing *Penn Cent. Transp. Co.*, 438 U.S. at 105).   Moreover, as noted by this Court, unlike the typewriter in *Sorrentino* that could be easily sold, here, "[d]ownloaded music of the kind at issue, in contrast, cannot be sold; the right to use the music is all there is, and the right is not transferable."   Order Denying MSJ at p. 7.   Additionally, the typewriter and fan can be sent home for potential use by others, while the digital music, by contrast, cannot even be used by others, despite the fact that the songs themselves may find themselves in the physical possession of others, as the Terms of Service forbid others from making any use of those files.

[71] It is also worth noting that in *Johnson v. King*, 85 So. 3d 307, 311 (Miss. Ct. App. 2012), the court looked at the issue presented in *Sorrentino* in depth, and found that the confiscation of a previously authorized drinking mug qualified as a taking, stating that "an offer to ship the confiscated, drinking mug home rings hollow since [the plaintiff] would still be deprived

Moreover, it is worth noting that while some of these cases hold that certain property may be confiscated for security purposes, that is not what occurred here. Defendant did not determine that there were any security issues with allowing the Plaintiff Class to listen to their previously purchased music; Defendant in fact admitted that there are no security concerns related to the Plaintiff Class retaining access to their music while in prison.[72]  These unique characteristics of this case further distinguish it from other cases cited by Defendant that evaluate a prisoner's takings challenge.  *See, e.g., Nevada Department of Corrections v. Cohen*, 581 F. Supp. 2d 1085, 1087 (D. Nev. 2008) (prisoners' typewriters were confiscated because one inmate had taken one apart and stabbed a corrections officer); *Savko v. Rollins*, 749 F. Supp. 1403, 1404 (D. Md. 1990) (DOC limited the types and quantity of materials that prisoners could keep in their cells to restrict hidden contraband and to improve fire and safety conditions).  Similarly, Defendant did not promulgate a general rule applicable to all digital music.  Here, the class is permitted to keep digital music files, just not the ones they purchased lawfully under the Digital Music Player Program.[73]

---

permanently of the use of his personal property."  Ultimately, the appellate court ordered the Defendant to either provide Johnson with a substitute mug "comparable to the one seized" or reimburse Johnson for the full amount of the mug Johnson had originally purchased.  *See id*. at 312.

[72] *See* ECF 140-10 at #44.

[73] Defendant's other cited cases are equally distinguishable.  *Searcy v. Simmons*, 299 F.3d 1220, 1223 (10th Cir. 2002), was a case in which a prisoner was required to send property to relatives because he lost privileges through a valid and previously established prison program, and did not

> iii. *Defendant did not Take the Plaintiff Class's Music Pursuant to the Keefe Terms of Service, nor do the Terms of Service Authorize Defendant's Digital Music Confiscation Policy*

Lastly, unable to establish that Defendant's Digital Music Confiscation Policy does not constitute an unconstitutional taking, Defendant instead attempts to argue in Section IV(H) of its Motion that the Keefe Terms of Service nonetheless "authorize the dispossession of music so as to negate any claims."[74]

This argument has no merit based on the plain language of both the Digital Music Confiscation Policy and the Terms of Service.   First and foremost, the Plaintiff Class's ownership interest in their right to access and use (listen to) the music was not taken pursuant to the Terms of Service; it was taken pursuant to the Digital Music Confiscation Policy, as described in the various confiscation notices that FDOC authored and distributed to the Plaintiff Class.[75]   Nowhere in any of these notices is a citation to the Terms of Service, an indication that the songs were being taken pursuant to the Terms of Service, or any reference to the Terms of Service whatsoever.[76]

---

even address a Takings claim.  The case of *Williams v. Meese*, 926 F.2d 994, 998 (10th Cir. 1991) had a one-paragraph discussion of a pro se procedural due process claim, not a Takings claim.  Similarly, *Pryor-El v. Kelly*, 892 F. Supp. 261, 270 (D.D.C. 1995), was a *pro se* case involving a procedural due process claim.

[74] ECF No. 138 at pp. 36-38.

[75] *See, e.g.,* ECF No. 140-18.

[76] *Id.*

To the contrary, the plain language of the notices describing the Defendant's Digital Music Confiscation Policy expressly state that the Plaintiff Class's right to listen to their music in prison was being taken for one singular reason – the fact that "Access Corrections' service of the Digital Music Player (MP3/4) Program will come to a close."[77] The Terms of Service that Defendant clings to relate only to the rights and privileges under the Digital Music Player Program, which, as noted by these various notices, was being *ended*, not enforced.  As such, the provisions in the Terms of Service that Defendant argues gives it the authority to "eliminate … the availability of digital music at any time without notice," were not the mechanism by which it took the songs, as the Digital Music Player Program had already been terminated by the time the Defendants' Digital Music Confiscation Program was enforced.

Even assuming *arguendo* that the Keefe Terms of Service somehow apply to the Defendant's unilateral implementation of the Digital Music Confiscation Policy, the Terms of Service plainly do not give Defendant the unfettered authority it claims to possess.[78]  Indeed, while this Court has acknowledged that the Terms of Service may have authorized Access – during the pendency of the MP3 Program

---

[77] *Id*.

[78] While it is clear that the Plaintiff Class's music was not taken by Defendant pursuant to the Terms of Service for the reasons stated herein, it is worth noting that Defendant is not a signatory to the Terms of Service, and has *expressly disclaimed* any agency relationship that might otherwise enable it to enforce the Terms of Service's provisions.  *See* ECF 138 at pp. 17-18 ("the Court must reject the alleged existence of an agency relationship between DOC and ACCESS.").

- to "block access to 'one or more' Permanent Downloads with no resulting credit to an inmate's account," the Court similarly found that the Terms of Service did not authorize "the Department [to] entirely abandon the program or … require inmates to surrender their media players."  ECF 64 at p. 2.  This analysis is even more persuasive here, where the Defendant implemented its confiscation policy after the conclusion of the MP3 Program.

A closer look at the specific provisions of the Terms of Service relied upon by Defendant support this Court's conclusions.  For example, the first of the two provisions relied on by Defendant is:

> You understand that conditions of Your stay as imposed by the facility, agency or any managing entity may impose further restrictions on any Permanent Download.  These restrictions may require the ACCESS Service to remove or otherwise block Your access to one of more Permanent Download and Your prepaid media account will not be credited.[79]

While Defendant relies solely on Judge Rosenberg's adoption of one of Judge Maynard's earlier Report & Recommendations in the *Rodriguez* matter, Judge Maynard's findings in that case – which related solely to the plaintiffs' state law breach of contract claims against Keefe, and not to any takings claim brought against the FDOC – do not support Defendant's position.  As noted by Judge Maynard in that R&R, the Access Provision reproduced above merely operates to insulate Keefe from liability if FDOC restricted access to one or more songs.  *See*

---

[79] ECF No. 138, pp. 13-14 (citing DE 56-1 at p. 2) ("Access Provision").

*Rodriguez v. JPay, Inc*., No. 19-14137-CIV, 2019 U.S. Dist. LEXIS 182672, at

*14-16 (S.D. Fla. Oct. 21, 2019) ("Oct. 21, 2019, *Rodriguez* R&R").  Defendant

has taken the position that because Judge Maynard found that Keefe is not liable if

FDOC takes away prisoners' access to and ability to use (listen to) their music,

FDOC therefore has the authority to do so.[80]  But, nowhere in the Oct 21, 2019,

*Rodriguez* R&R does Judge Maynard find that FDOC is permitted to take away the

prisoners' access to and ability to use (listen to) every single song purchased

during the pendency of the program without just compensation.  On the contrary,

Judge Maynard includes numerous reasons why Defendant's Digital Music

Confiscation Policy can constitute an unconstitutional taking and a violation of

substantive due process, regardless of her finding that Keefe is not responsible for

a breach of contract as a result of the Defendant's actions.

Moreover, while the Access Provision may have enabled Defendant to direct

Keefe to restrict access to certain songs in certain situations during the pendency of

the Program,[81] its plain language does not give Defendant the unfettered ability to

take <u>all</u> of the songs lawfully purchased by the Plaintiff Class.  While the Access

---

[80] *See* ECF 138 at p. 36 (citations omitted).

[81]  The Access Provision would have typically been enforced if an inmate was sent to confinement or if a song created a security risk, such as songs with salacious content.  This is not what occurred here.  As acknowledged by FDOC, permitting the Plaintiff Class to maintain the songs they lawfully purchased does not create a security risk, and inmates are still permitted to possess digital music; as such, the Digital Music Confiscation Policy was not put into place for security reasons.  *See* ECF No. 140-7, (Rule 30(b)(6) Deposition of FDOC (Carl Wesley Kirkland, Jr.)) at 6:20-7:2.

Provision envisions FDOC directing Keefe to "block access to one or more" songs, that is not what occurred pursuant to Defendant's Digital Music Confiscation Policy.   Instead, Defendant unilaterally terminated the Digital Music Player Program, confiscated the players and rendered them contraband, and removed the kiosks.   Keefe did not carry out, at the direction of Defendant, the Digital Music Confiscation Policy; rather, the Digital Music Confiscation Policy is a uniquely FDOC policy, carried out by Defendant.

Additionally, any assertion that the songs were taken pursuant to the Access Provision is completely inconsistent with Defendant's position that "all [of the Plaintiff Class's music is] currently available and retrievable by any inmate at any time from ACCESS."  ECF No. 138 at p. 7, ECF No. 140-19 at p. 16 ("Inmates access to their music did not cease upon termination of the Keefe contract.").  Put simply, Defendant cannot on one hand argue that it enforced a Term of Service wherein it directed Keefe to block access and availability of songs, and on the other hand argue that the Plaintiff Class still has full access and availability to those same songs.   As such, Defendant's argument that the Access Provision granted it the right to carry out the Digital Music Confiscation Policy is nothing more than a *post hoc* attempt to legitimize its unconstitutional taking.

The second provision of the Terms that Defendant asserts granted it the right to take all of the Plaintiff Class's lawfully purchased music is the provision that

states: "Availability of any Permanent Download is subject to change at any time without notice to You."[82]   Provisions such as this are standard, and like the Access Provision is the type of term that works to insulate music providers, such as Keefe, if they have to make certain changes to the availability of songs, which could occur for a variety of reasons.   Importantly, this provision does not grant FDOC the ability to do anything, and as such, is for the benefit of Keefe, who is not a party to this lawsuit.   Lastly, "change" does not mean completely abandon.   *See* Order Denying MSJ at p. 2; *Rodriguez* R&R at *3 (citation omitted).

As such, Defendant has not produced any evidence or law to refute this Court's finding that there is nothing in the Terms of Service that permit "the Department [to] entirely abandon the program or … require inmates to surrender their media players."  *See* ECF 64, Order Denying Summary Judgment at p. 2.

**C.    Defendant's Memorandum of Law Fails to Refute Well-Settled Law Establishing that Defendant's Digital Music Confiscation Policy Violates Substantive Due Process**

In Section IV(G), Defendant argues that summary judgment is warranted in its favor on the Plaintiff Class's substantive due process claims because "[its] conduct does not shock the conscious," citing to various cases with little to no explanation as to their relevance to the analysis.[83]   Although Defendant's actions are shocking, that is not the correct standard.   As laid out in detail in Plaintiff's

---

[82] ECF No. 138, pp. 14 (citing DE 56-1 at p. 5).
[83] *See* ECF 138 at pp. 35-36.

Motion for Summary Judgment,[84] the correct standard for the Plaintiff Class's substantive due process claim is whether the challenged "regulation is arbitrary and capricious, does not bear a substantial relation to the public health, safety, morals, or general welfare, and is therefore an invalid exercise of the police power." *Eide v. Sarasota County*, 908 F.2d 716, 721 (11th Cir. 1990); *see also Exec. 100, Inc. v. Martin Cty.*, 922 F.2d 1536, 1540 (11th Cir. 1991).

A broad-based regulation affecting all incarcerated people like this one, rather than a ministerial or administrative act, is legislative, rather than executive, and as such, traditional property rights trigger substantive due process protections, and the Plaintiff Class need not demonstrate that the action shocks the conscience. *See McKinney v. Pate*, 20 F.3d 1550, 1557 n. 9 (11th Cir. 1994); R&R at *17 (noting that FDOC failed to provide any "legal authority for the proposition that its legislative acts are not actionable unless they rise to a conscience shocking level."). Given all the alternatives Defendant had at its disposal to avoid this taking,[85] and its decision not to take such actions, Defendant's Digital Music Confiscation Policy was arbitrary, capricious, was not substantially related to any government action, and therefore violated the Substantive Due Process Clause.

---

[84] *See* ECF 140 at pp. 32-34.
[85] *See* ECF 140 at pp. 20-25.

## CONCLUSION

For all the foregoing reasons, Plaintiffs respectfully request that Defendant's Motion be denied.

**Certificate of Word Limit.**  Pursuant to N.D. Fla. Local Rule 7.1(F), this motion contains 7,949 words.

Respectfully submitted,

Dante P. Trevisani, Esq.
Florida Bar No. 72912
dtrevisani@floridajusticeinstitute.org
Ray Taseff, Esq.
Florida Bar No. 352500
rtaseff@floridajusticeinstitute.org

Florida Justice Institute, Inc.
100 S.E. 2nd Street
3750 Miami Tower
Miami, Florida 33131-2309
305-358-2081
305-358-0910 (FAX)

By:    *s/Dante P. Trevisani*
        Dante P. Trevisani, Esq.

Shawn A. Heller, Esq.
Florida Bar No. 46346
shawn@sjlawcollective.com
Joshua A. Glickman, Esq.
Florida Bar No. 43994
josh@sjlawcollective.com

Social Justice Law Collective, PL
974 Howard Ave.
Dunedin FL 34698
Tel: (202) 709-5744

By:   *s/Joshua A. Glickman*
Joshua A. Glickman, Esq.


## <u>CERTIFICATE OF SERVICE</u>

I HEREBY CERTIFY that I electronically filed today, March 24, 2020, the foregoing with the Clerk of the Court using the CM/ECF system, which will send notification of such filing to all persons registered to receive electronic notifications for this case, including all opposing counsel.

By:   *s/Joshua A. Glickman*
Joshua A. Glickman, Esq.