UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF FLORIDA
Tallahassee Division

WILLIAM DEMLER, individually,
and on behalf of all others similarly situated,

    Plaintiff,

vs.                                        Case No. 4:19-cv-00094-RH/GRJ

MARK S. INCH, in his official capacity as
Secretary of the Florida Department of
Corrections,

    Defendant.
_____/

**PLAINTIFFS' *CORRECTED* REPLY IN SUPPORT OF
MOTION FOR SUMMARY JUDGMENT**

Plaintiffs hereby reply to Defendant's Response to Plaintiffs' Motion for Summary Judgment, ECF 147 ("Response").[1]

**A.    Defendant's Response Fails to Rebut Plaintiffs' Undisputed Facts**

One of the primary purposes of a response memorandum is to rebut the moving party's statement of facts. *See* L.R. 56.1(C), N.D. Fla. ("The [opposing] memorandum must respond to the moving party's statement of facts as would be appropriate in an appellate brief."). Defendant's Response fails to do this entirely; Defendant's Response does not cite to a single factual assertion in Plaintiffs'

---

[1] All defined terms in Plaintiffs' Corrected Motion for Summary Judgment, ECF 140 ("Motion"), shall be ascribed the same meanings herein.

Motion (whether to rebut or admit) – thus admitting a significant number of material facts that warrant the granting of summary judgment for Plaintiffs. *See McCiskill v. Smith*, 2012 U.S. Dist. LEXIS 24155, at *7 (N.D. Fla. 2012) ("[A]ny facts included in Defendant's statement of material facts that are not controverted in Plaintiff's response are deemed admitted.") (citations omitted); *Kornagay v. Given*, 2014 U.S. Dist. LEXIS 38377, at *9 (N.D. Fla. 2014) ("If a party … fails to properly address another party's assertion of fact as required by Rule 56(c), the court will consider the fact undisputed for purposes of the motion for summary judgment.").

As such, Defendant has admitted the following crucial facts:

### i.    *Defendant Promoted Permanent Ownership of Purchased Music While Incarcerated*

- "At least one widely distributed advertisement [regarding the Digital Music Player Program] … prominently titled "**Florida Department of Corrections NOW ACCEPTING ORDERS,**" … includ[ed] the following representation: … 'once music is purchased, you'll always own it!'" [2]

- "Without the purchase of [Keefe's] Retention Service, the songs could not be used outside of the prison after the security timer expired. Therefore, the purchase of the song credits only entitled Plaintiff to access, listen, and use his purchased songs *while incarcerated*."[3]

---

[2] *Id.* at pp. 5-6.
[3] *Id.*

- "[B]y purchasing songs through the Digital Music Player Program, Plaintiff was buying the digital music file and the right to listen to the music while in prison."[4]

### ii. *Defendant Profited From the Sale of Music to Plaintiffs*

- "From 2011 to 2017, FDOC prisoners purchased over six million songs through the Digital Music Player Program. These song purchases cost prisoners over $11 million. The FDOC itself realized over $1 million in commissions on these sales during the same time period."[5]

- "Over the course of the contract, prisoners purchased an average of 300 songs each, at an average cost of roughly $500 per participating inmate."[6]

### iii. *Plaintiffs' Right and Ability to Listen to Their Music in Prison was Completely Extinguished*

- "[I]n April 2017, although not required by either the JPay Contract or the Keefe Contract, FDOC, <u>in its sole authority</u>, quickly established and enforced a statewide policy under which it confiscated <u>all</u> songs that had been lawfully purchased under the Digital Music Player Program."[7]

- The "right to listen to the music" purchased by the Plaintiff Class is "non-transferable, non-assignable, and cannot be resold."[8]

- "Participating inmates had the right to export, burn, or copy their purchased songs, but that right was limited to that specific inmate's personal use, and not for any redistribution … it is undisputed that prisoners purchased these songs to listen to them and enjoy them *while in prison*."[9]

---

[4] *Id.* at p. 20.
[5] *Id.* at p. 7.
[6] *Id.*
[7] *Id.* at p. 17.
[8] *Id.* at p. 19.
[9] *Id.*

-3-

- "Nowhere … do the Terms provide for the ability of the FDOC … to entirely abandon the program or require inmates to surrender *all* of their previously purchased music."[10]

### iv.  *Defendant Had Several Options for the Retention of Plaintiffs' Music*

- In 2014, FDOC initially awarded a new MP3 Player Contract to Keefe, which "would have allowed prisoners to keep all of the music that they had previously purchased."[11]

- "JPay had previously indicated to FDOC that … if Keefe were able to transfer the music that prisoners had purchased … JPay was willing to put that music on each prisoner's tablet for them to listen to … was willing to 'pay the $25.00' fee … and was even willing to provide "the manual labor … to perform this substantial task."[12]

- "Keefe further indicated to FDOC that not only was it technically feasible for Keefe to [transfer each participant's songs to a CD for subsequent transfer to that prisoner's JPay tablet], but that [Keefe] was willing to do so."[13]

- FDOC had the ability to negotiate with JPay for full credits, but "made the internal determination that obtaining or providing compensation for these prisoners was less of a "priority" than other negotiated terms and value-added services."[14]

- "The JPay Contract does not require that FDOC inmates relinquish their existing music players or their previously purchased digital music."[15]

- "FDOC could have simply allowed those inmates who participated in the Digital Music Player Program to keep their Digital Music players

---

[10] *Id*. at p. 19, n.98.
[11] *Id*. at p. 10.
[12] *Id*. at p. 22.
[13] *Id*.
[14] *Id*. at p. 22-23.
[15] *Id*. at p. 17.

-4-

      in an unlocked state, and thus retain the ability to listen to all of their previously purchased music."[16]

- "FDOC admitted that it was unaware of – and thus did not rely on – any incidents demonstrating a security risk attendant to simultaneously possessing both a digital media player and a tablet."[17]

- "FDOC explicitly admits that the confiscation of lawfully purchased property without compensation was done to allow FDOC and its new vendor to realize additional profits."[18]

    **B.**    **<u>Defendant's Reliance on Inmate Testimony is Improper and Irrelevant</u>**

Defendant has now admitted that the right purchased by Plaintiffs was their "right to use" (listen to) their purchased music while in prison.[19] In their Motion, Plaintiffs outline how they enjoy a protected property interest in that "right of use," and how Defendant's actions interfered with their property interest in that "right of use" so as to violate their constitutional rights. *See* ECF 140 at pp. 25-26 (Plaintiffs have a protected property interest "in their ability to listen to [their purchased] songs while in prison"), *citing Parratt v. Taylor*, 451 U.S. 527 (1981); *Givens v. Alabama Dept. of Corr.*, 381 F.3d 1064 (11th Cir. 2004); *Ruckelshaus v. Monsanto Co.*, 467 U.S. 986, 1003 (1984); *see also* ECF 140 at pp. 27-32 (Defendant's actions qualify as both a categorical and a regulatory taking), *citing Lucas v. S.C. Coastal Council*, 505 U.S. 1003, 1015 (1992); *Horne v. Dep't of*

---

[16] *Id.* at p. 23-24.
[17] *Id.* at p. 24.
[18] *Id.*
[19] *See* ECF 147 at p. 5.

*Agric.*, 135 S. Ct. 2419, 2428 (2015); *Penn Central Transp. Co. v. City of New York*, 438 U.S. 104, 124 (1978).

Defendant argues that "[t]he act of listening to music does not involve or create any economic value nor does it have any economically beneficial use. To that extent, there can be no "taking."[20] Unsurprisingly, and as previously pointed out by this Court, Defendant has not provided any authority for this crucial proposition. *See* ECF 64 at p. 8 ("Taking Mr. Demler's interest [in listening to the] purchased music he was told would be permanently available, without just compensation, if that is what occurred, may indeed be unconstitutional. The Department has cited no authority to the contrary.").

Defendant instead relies on Plaintiffs' deposition testimony to support its legal conclusions. For instance, Defendant represents that Gisi "testified that … the music has no economic value."[21] However, despite Defendant's explicit representation, nowhere in Gisi's deposition did he ever testify, "the music has no economic value." This is simply false. Moreover, the legal determination of whether Plaintiffs' purchased right to use (listen to) their purchased music has economic value or constitutes a unconstitutional taking is the proper province of this Court, and does not turn on the beliefs of individual prisoners as induced by Defendant's counsel during deposition. *See U.S. v. Stewart*, 2004 U.S. Dist.

---

[20] ECF 147 at p. 5.
[21] *Id*. at p. 6.

-6-

LEXIS 789, at *5 (S.D.N.Y. 2004) ("[Legal] determinations are the exclusive province of the court."), *citing U.S. v. Ingredient Tech. Corp.*, 698 F.2d 88, 97 (2d Cir. 1983) ("questions of law are for the court."); *U.S. v. King*, 2006 U.S. Dist. LEXIS, at *20 (M.D. Fla. 2006) (same).

Defendant alternatively argues that even if this Court finds that Plaintiffs enjoy a protected property interest in their right to use (listen to) their purchased music, that there is still no unconstitutional taking, because "[i]nmates could always allow others to listen to their music … [e]ven today, the Plaintiffs can still allow others to listen to the music," citing solely to the deposition testimony of Plaintiffs in support.[22]

Once again, the induced opinions of individual prisoners is irrelevant here, where the undisputed facts demonstrate that neither Gisi, Pula, or Demler "could allow" others to listen to their music pursuant to the Terms, at any time, for any reason:

> [W]hile Defendant may have induced [Plaintiff] at deposition to acknowledge his <u>belief</u> that [allowing others to listen to his music] was allowed, [it] would in fact be in violation of the Terms of Service, which granted Mr. Demler a non-transferable right to personally listen to his purchased music while in prison, and *not* the ability to transfer that right to his cellmate, his uncle, or anyone other than himself for his own personal use.

---

[22] *Id*. at p. 7.

ECF 153 at p. 13, *citing* ECF 56-1 at pp. 2-3; ECF 140-5 (MP3 Player User Guide) at p. 43; *Rodriguez* R&R at *12-13.

Defendant next cites to Plaintiffs' deposition testimony in support of its argument that it did not make, or is otherwise not responsible for, the undisputed promises of permanent ownership of purchased music that were made to Plaintiffs.[23]  For instance, Defendant cites to Demler's deposition for the proposition that "Demler has admitted that he knows of no proof that DOC 'published' any of the advertisements,"[24] and to Gisi's testimony for the proposition that "the advertisements were Access Corrections flyers."[25]  However, the personal knowledge of an incarcerated individual who has no personal ability to observe the FDOC's inner workings is irrelevant where, again, the undisputed facts demonstrate that the same advertisement that promised Plaintiffs that it would "always own" purchased music was labeled, in lettering bigger than any other text on the page and in a contrasting color for emphasis:

# Florida Department of Corrections
# NOW ACCEPTING ORDERS.[26]

---

[23] ECF 147 at pp. 10-12.
[24] *Id.* at p. 10.
[25] *Id.* at p. 11.
[26] *See* ECF 140-8 (Order Form).

Moreover, Defendant was aware of, reviewed, cleared, and approved all advertisements – including the advertisement referenced above – and could have revised the advertisement or not approved its distribution if it had any disagreement with its content or the representations made therein. *See* ECF 140-7 (Rule 30(b)(6) Deposition of FDOC (Carl Wesley Kirkland, Jr.)) at 7:16-7:25; 8:1-8:9.

Finally, contrary to Defendant's statement that "at no time did DOC ever review any of ACCESS' written materials for content,"[27] internal communications between Defendant and Keefe demonstrate that Defendant explicitly reviewed the referenced advertisements and posters for purposes of content and accuracy. *See* ECF 153-1 (Email communication between FDOC and Keefe regarding FDOC's revision and approval of MP3 Order Form and Advertisement).[28]

### C. The Undisputed Facts Asserted by Plaintiffs Support a Finding of Summary Judgment in their Favor

#### i. *The Relevance of the Terms*

Unable to provide any authority for its position that an individual's right to use (listen to) their own purchased music can never form the basis of a takings claim, Defendant once again argues that the Terms nonetheless authorize

---

[27] ECF 147 at p. 11.
[28] Defendant argues that there is no taking because Plaintiffs do not own the underlying copyrights, *see* ECF 147 at pp. 8-9, and that Plaintiffs music has not been "lost." *Id*. at pp. 14-16. As discussed in Plaintiffs' Response to Defendant's Motion for Summary Judgment ("Plaintiffs' Response"), Plaintiffs have not made either claim. *See* ECF 153 at pp. 7-12.

Defendant to permanently "eliminate access to all music files" without any compensation.[29] [30]

As fully discussed in Plaintiffs' Response, this *post hoc* attempt by Defendant to legitimize its unconstitutional taking fails, because Plaintiffs' ownership interest in their right to use (listen to) their music was not taken pursuant to the Terms; it was taken pursuant to the Defendant's Digital Music Confiscation Policy, carried out by Defendant in its sole authority.[31] Even assuming *arguendo* that the Terms somehow apply to Defendant's unilateral implementation of the Digital Music Confiscation Policy, they plainly do not give Defendant the unfettered authority it claims to possess.[32]

Instead, the Terms define the scope of the property interest purchased by Plaintiffs and taken by Defendant, specifically, the right to use (listen to) their purchased music while in prison ("Use Right"), a right that the Terms define as non-transferable and non-assignable, and which the Parties therefore agree cannot be sold. *See* ECF 147 at pp. 4, 16-17, 24, 27 (FDOC acknowledging that the property right at issue involves a license "that is non-transferrable, non-assignable,

---

[29] ECF 147 at p. 21.
[30] It is also worth noting that Defendant is not a signatory to the Terms, and as such, Defendant's reliance on the Terms for its *post hoc* attempt to escape liability is misplaced, especially given that Defendant has expressly disclaimed any agency relationship with Keefe. In short, Defendant cannot use the terms of an agreement between Keefe and the Plaintiffs as the basis for its defense for its own unconstitutional taking.
[31] *See* ECF 153 at pp. 25-26.
[32] *Id*. at pp. 26-30.

non-exclusive, and which cannot be sold."). Moreover, because the Terms provide that none of the purchased music can be listened to outside of any FDOC facility without the separate and additional purchase of Keefe's Retention Service, the Terms clearly define the Use Right at issue – and the right that has been entirely extinguished by Defendant – as Plaintiffs' right to personally use (listen to) their music while in prison.[33] [34]

### ii. Plaintiffs' Use Right Constitutes a Constitutionally Protected Property Right

Defendant next argues that this Use Right does not constitute a constitutionally protected property interest, precluding a finding that a taking has occurred.[35]

Defendant asserts that because the songs were non-transferrable and non-assignable, they had no economic value,[36] and therefore the right to listen to them cannot constitute a constitutionally protected property right that can be subject to a taking.[37] As argued in Plaintiffs' Response, Defendant has taken this untenable

---

[33] *See* ECF 153 at p. 8.
[34] It is also worth noting that in interpreting the Terms, which do not include a merger clause, the representations made in the FDOC Order Form may properly be considered.
[35] *See* ECF 153 at pp. 23-30.
[36] It is worth noting that Defendant's claim that Plaintiffs' Use Right has no economic value is inconsistent with Defendant's assertion that if family members of the Plaintiff Class listened to the music "an economically beneficial use to them has resulted." ECF 147 at p. 34. This argument is without merit, because the Terms prohibit it, but regardless, by making this argument, Defendant has essentially conceded that the ability to listen to the music has economic value.
[37] *See* ECF 147 at pp. 6-7.

position despite the fact that the "Use Right" cost Plaintiffs $1.70 per song, and would currently cost Plaintiffs at least $1.00 per song to replace.[38] It belies logic and reason to believe that this "Use Right" has no economic value, where Plaintiffs paid millions of dollars specifically for just that right.

Contrary to Defendant's unsupported arguments to the contrary, the "Use Right" does give rise to a protected property interest, as demonstrated by Defendant's analysis of copyright protections within the same context. In arguing that Plaintiffs' Use Right does not constitute a protected property interest, Defendant contrasts Plaintiffs "use right" (or, right to use), with a copyright (or, right to copy), essentially arguing that while a copyright constitutes constitutionally protected property that could be subject to a taking, a "use right" enjoys no similar protections.

Unsurprisingly, Defendant offers no authority for this proposition; indeed, there is nothing inherently different about these two ownership rights that would warrant a different analysis. A copyright, as described by its name, is the right to copy, and a "use right," like the one at issue here, is the right to use. Both ownership rights are intangible, and both are often non-assignable, non-transferrable, and subject to a variety of restrictions. If the right to copy constitutes a protected property interest, then it would stand to reason that the right to use is

---

[38] *See* ECF 153 at pp. 21-22.

similarly protected.  *See* Order Denying MSJ at *7 (noting that "the right to use the music is all there is."); *Rodriguez* R&R at *10-13; *Rodriguez* R&R at *13 n.7 ("inmates purchased 'a nonexclusive, nontransferable right to use the permanent download[s]'") (quoting Terms at ¶8 (emphasis in *Rodriguez* R&R)); *see also* ECF 140 at p. 26, *citing Ruckelshaus v. Monsanto Co.*, 467 U.S. 986, 1003 (1984) (finding that the Takings Clause protects intangible property rights no less than interests in real property); *Horne v. Dep't of Agric.*, 135 S. Ct. 2419, 2428 (2015).

Defendant then argues that because multiple inmates could purchase their own Use Right to the same song, the analysis of whether Plaintiffs' Use Right can be subject to an unconstitutional taking is somehow impacted.[39]  While it is true that multiple inmates could purchase their own Use Right to the same underlying musical composition, each prisoner was purchasing their own "Use Right," and Defendant cites to no law suggesting that this analysis is impacted by the fact that the right to use (listen to) the same song could be separately purchased and used by more than one prisoner.

    iii. *Defendant's Digital Music Confiscation Policy Constitutes an Unconstitutional Taking*

Unable to establish that Plaintiffs' purchased Use Right does not constitute constitutionally protected property, Defendant again argues that because Plaintiffs

---

[39] *See* ECF 147 at pp. 24-26.

retain some level of control over the music that has been taken, no taking has occurred.[40]

In support, Defendant attempts to rely on the already-distinguished string of cases that it has repeatedly cited multiple times for the proposition that Defendant can order that property be sent outside of the prison.[41] As argued in Plaintiffs' Response, both this Court and the *Rodriguez* Court have already distinguished these cases multiple times. *See* ECF 153, *citing* ECF 64 at p. 6; *Rodriguez* R&R at *10 (S.D. Fla. Oct. 30, 2019) (same); *see also* ECF 153 at p. 24.

Defendant further asserts that because Demler and Gisi testified that they believed that their family members could listen to their music if Access mailed a CD to their families, and Gisi testified that he believed his could have his mother play him his music over the phone, no taking has occurred.[42] These arguments are absurd. Both of these hypothetical tasks would violate the Terms,[43] and both would require the separate purchase of the Retention Service as well as a phone call.[44]

---

[40] *See* ECF 147 at pp. 30-35.
[41] *Id*. at p. 30.
[42] *Id*. at p. 31.
[43] *See* ECF 56-1 at pp. 2-3; ECF 140-5 at p. 43.
[44] In Response to Sections (III)(D) and (E), Plaintiffs incorporate by reference their responses to those arguments in Response at pp. 30-31.

## CONCLUSION

Plaintiffs therefore respectfully request that the Court grant summary judgment in their favor.

**Certificate of Word Limit.**  Pursuant to N.D. Fla. Local Rule 7.1(F), this motion contains 3,199 words.

>Respectfully submitted,
>
>Dante P. Trevisani, Esq.
>Florida Bar No. 72912
>dtrevisani@floridajusticeinstitute.org
>Ray Taseff, Esq.
>Florida Bar No. 352500
>rtaseff@floridajusticeinstitute.org
>
>Florida Justice Institute, Inc.
>100 S.E. 2nd Street
>3750 Miami Tower
>Miami, Florida 33131-2309
>305-358-2081
>305-358-0910 (FAX)
>
>By:   *s/Dante P. Trevisani*
>         Dante P. Trevisani, Esq.
>
>Shawn A. Heller, Esq.
>Florida Bar No. 46346
>shawn@sjlawcollective.com
>Joshua A. Glickman, Esq.
>Florida Bar No. 43994
>josh@sjlawcollective.com
>
>Social Justice Law Collective, PL
>974 Howard Ave.
>Dunedin FL 34698
>Tel: (202) 709-5744

By: *s/Joshua A. Glickman*
Joshua A. Glickman, Esq.

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that I electronically filed today, April 1, 2020, the foregoing with the Clerk of the Court using the CM/ECF system, which will send notification of such filing to all persons registered to receive electronic notifications for this case, including all opposing counsel.

By: *s/Joshua A. Glickman*
Joshua A. Glickman, Esq.